**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACK MARTY, Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiff, <br><br>     v. <br><br> WPP PLC, MARK READ, JOANNE WILSON, and BRIAN D. LESSER <br><br>                 Defendants. | Case No. 1:25-cv-08365 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Plaintiff Jack Marty ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by WPP PLC ("WPP" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of WPP's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired WPP common stock between February 27, 2025, to July 8, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.    Defendants provided investors with material information concerning WPP's expected revenue for the fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's continued efforts to revitalize and simplify its media division to obtain new wins and retain clientele, repeated claims that the "ramp-up of new wins" and ongoing sales to existing clients would offset lost clientele, and a continued emphasis on the Company's self-proclaimed "cautious" guidance that purportedly accounted for "broad macro uncertainty."

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of WPP's media arm; notably, that it was not truly equipped to handle the ongoing macroeconomic challenges while competing effectively and had instead begun to lose significant market share to its competitors. Such statements absent these material facts caused Plaintiff and other shareholders to purchase WPP's securities at artificially inflated prices.

4.    On July 9, 2025, WPP published a trading update for the first half of 2025, alerting investors that the company had allegedly "seen a deterioration in performance as Q2 has progressed."   The Company attributed its misfortune to both "continued macro uncertainty weighing on client spend and weaker net new business than originally anticipated," at least in part

due to "some distraction to the business" as a result of the continued restructuring of WPP Media a.k.a. GroupM.

5.      Investors and analysts reacted immediately to WPP's revelation. The price of WPP's common stock declined dramatically. From a closing market price of $35.82 per share on July 8, 2025, WPP's stock price fell to $29.34 per share on July 9, 2025, a decline of about 18.1% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant WPP's United States headquarters are located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased WPP common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in WPP is attached hereto.

12.     WPP Boots Alliance, Inc. is a British corporation with its principal executive offices for its United States operations located at 3 World Trade Center, 175 Greenwich Street, New York, NY 10007. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "WPP."

13.     Defendant Mark Read ("Read") was, at all relevant times, the Chief Executive Officer and Executive Director of WPP.

14.     Defendant Joanne Wilson ("Wilson") was, at all relevant times, the Chief Financial Officer and a Director of WPP.

15.     Defendant Brian D. Lesser ("Lesser") was, at all relevant times, the Global Chief Executive Officer of WPP

16.     Defendants Read, Wilson, and Lesser are sometimes referred to herein as the "Individual Defendants." WPP together with the Individual Defendants are referred to herein as the "Defendants."

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of WPP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     WPP is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to WPP under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Company Background

20.     WPP is a global communications company that offers advertising, media management, consultancy, public relations, as well as branding and identity services worldwide.

21.     WPP Media, formerly GroupM, media arm of WPP, which uses data analytics and newer AI technologies to create, plan, and buy integrated media campaigns for its global clients.

### The Defendants Materially Misled Investors Concerning

### WPP's Revenue Outlook for Fiscal Year 2025

#### February 27, 2025

22.     On February 27, 2025, WPP published a press release announcing 2024 full year preliminary results and providing projections for fiscal 2025.  In pertinent part, Defendant Wilson detailed the Company's fiscal projections during the corresponding earnings call as follows:

we are guiding a like-for-like range of flat to minus 2%. This does reflect a degree of caution in light of the uncertain macro environment as well as our expectation of the impact of net new business as we go through the year.

**We expect our like-for-like performance to strengthen over the course of 2025** with the H1 impacted by the runoff of historical client losses before recent wins fully ramp up. **This will be reflected particularly in GroupM's performance in the first half**. On profit, we expect to hold headline operating margin flat, excluding the impact of FX with the benefit of annualized structural cost savings and continued disciplined cost management offsetting that incremental investment in WPP Open, AI and data as well as the margin drag from the sale of FGS.

(Emphasis added).

23.     During the call, Defendant Lesser detailed his high-level vision for GroupM, the media arm of WPP, covering the division's 5 key priorities and discussing their AI data strategy in pertinent part as follows:

Today, I'm going to focus on 2 key areas. The first is GroupM's 5 strategic priorities. And the second is our data strategy.

. . .

first, data and technology. We are fearlessly embracing AI and technology with a future-focused Open platform designed for tomorrow. WPP Open and Media Studio from the backbone of this approach, and we're driving towards 100% adoption from our clients. This will enable our shift from ID to AI that underpins our data strategy.

Second, people. We are up-leveling our talent by investing in technical employees and workforce development, ensuring alignment with our clients' future needs. Additionally, within the global organization, **I have restructured the team to focus on what's most important to our business** by appointing 4 new roles focused on clients, growth, transformation and operations and market expansion.

Third, innovation. **We are entirely focused on innovation, introducing new proprietary trading models and next-generation media products**. This will allow us to offer more performance to our clients at efficient prices, using our expertise, scale and data capabilities to redefine industry standards.

Fourth, collaboration. We're **improving internal and external collaboration across GroupM and WPP integrating media, creativity and production more effectively**.

6

And finally, fifth is our org design. ***We are further simplifying our structure*** to become a unified company with one voice to clients and partners. ***In 2024, we made significant strides in eliminating complexity, but we know that we have to be simpler and there is more work to do.***

. . .

***2025 marks a defining year for GroupM. Our strategic priorities, AI-driven data strategy and commitment to innovation will position us as the industry leader. With our unparalleled global capabilities and relentless focus on simplification, efficiency and growth, we will drive results for our clients as true business partners***.

(Emphasis added).

24.     Defendant Read highlighted the Company's focus on GroupM's success, stating, in pertinent part:

let me outline our priorities for 2025. And look, I need to start by acknowledging again that 2024 did not end quite as we wanted.

. . .

As I look at 2025, there are really 3 things that we need to do as a company, deliver on the promise of WPP Open, get GroupM back to growth and win more new business. And each of these are really related.

. . .

For GroupM, you heard Brian's plan. He has a great sense of urgency around data, around proprietary media and around new business with a focus on the U.S.

25.     During the question-and-answer segment, Defendant Wilson elaborated on their projections, pertinently highlighting that the "bottom end" of the Company's guidance incorporates both a more cautious macroeconomic environment and potential Company underperformance during the following exchange, in pertinent part:

<Q: Adam Ian Berlin – UBS Investment Bank – Director and Equity Research Analyst> Adam Berlin from UBS. The midpoint of the guidance for next year is roughly the same as what you delivered in 2024. And I think everyone is a bit confused about why we're not going to get an improvement next year, given you did do better in account wins in '24 than '23. China is a really easy comp and there

are a few other things that kind of went wrong this year. Can you just give us a bit more of a breakdown, maybe by segment or just help us understand why you're not guiding for an improvement in organic growth? That's the first question.

Second, a similar type question on margins. How are you going to deliver flat margins with negative growth? Does that mean staff incentives are going to remain low again? What else is there that means we should believe that you can deliver the flat margins in that environment?

And, third question is you helpfully give this metric of average net debt divided by headline EBITDA to give us a kind of average leverage. And that number is still quite high in '24, but that's probably because the FGS revenue receipts went in there. So can you give us any guidance on where you expect that metric to be at the end of '25? Because I assume that's how you think of capital allocation.

. . .

<A: Joanne Wilson> On our guidance, we've guided to flat to minus 2%. And you're right, the midpoint is in line with 2024. As we think about the bottom end and the top end of that guidance, there's a couple of things to consider. Q4 was softer for us than we were expecting. We talked about softer client discretionary spend. And in the first couple of months of the year, ***the macro uncertainty has not improved. If anything in the last few weeks, I think it's got more uncertain. And that makes us cautious, particularly in the first half from the perspective of project-based spend and client discretionary spend. And that's really reflected in that range on the bottom end.***

The second factor is our net new business. Look, we were encouraged by the progress we made in the second half on net new business. Net new business for 2024 was flat with 2023, but it was higher in the second half, so skewed to that second half.

The important thing to think about net new business is the sequencing of that and how it translates to like-for-like***. So in the first half of the year, as I said, we will see a bigger impact from client losses, particularly in the first half of 2024 before we see the full ramp-up of some of those client wins. So some of those client wins, which were fantastic and will be great clients for us, will not start to ramp up until Q2***. So I think that's important to think about those 2 levers in the guidance.

***And at the bottom end, as I say, it assumes a more cautious macro perspective as we go throughout 2025. And it also assumes that we don't see continued momentum in our net new business, which we are expecting to***. At the top end of the guidance, obviously, you see the flip of that. The macro, I think, will remain challenging in Q1, but we start to see an improved improvement as we go through the year, and we continue to build on that net new business momentum. And the

pipeline is healthy, and we've got many good opportunities. So that's really where we are on the guidance.

(Emphasis added).

26.    During the segment, Defendant Lesser highlighted the improvements resulting from the simplification of the Group M organization, in pertinent part, during the following exchanges:

<Q: Steven Craig Thomas Liechti – Deutsche Bank AG – Research Analyst> . . . And then finally, just a question for Brian. In terms of the plan to move to where you want to move to, I know it's -- everything is changing fast. But kind of where are you in that journey in terms of your go-to-market? When do you think your go-to-market strategy will be absolutely right for what you want to do?

. . .

<A: Brian D. Lesser> In terms of where we are on our journey and when we'll be sort of satisfied with our go-to-market, **we have some more work to do in terms of simplifying the GroupM organization**. Our client expectation is that we bring them the best of the group in every engagement. ***But we're -- in terms of our go-to-market, we're there now. I mean we are competing effectively. We are winning pitches. We are building businesses with our clients. We have everything we need to compete, win and retain clients now***. The only constant in this industry is change. So you'll see us evolve, but that's the expectation of our clients.

. . .

<Q: Joseph Philip Thomas – HSBC – Analyst> . . . There's been a lot of debate about what was wrong with GroupM in the past. You've talked about what you're doing right now, but perhaps you could identify what you think was wrong there?

And fundamentally, how that's changing? I know you put your 5 priorities up on the screen. And then finally, a question on the interest -- the changing interest line this year. The guidance has gone up a bit. What has moved there to do that really?

. . .

<A: Brian D. Lesser> Joe, on your question, what was wrong in the past? I mean, ***there was nothing wrong in the past. GroupM is a big, vibrant growing business. I would say the one thing I've observed is perhaps GroupM was too complex and not focused enough on our clients.***

And we've made those changes, and we'll continue to make those changes. **We're relentlessly focused on our clients**. And through the 5 priorities I discussed, we'll invest in our platform. We have a market-leading platform. And **I think some of our competition has been good about positioning legacy data assets as a future for strategy and we have a different take on that and we're winning business with that strategy**.

So we'll focus on our platform, our people. We will build the culture of innovation. Many of the innovations that have come out of the media industry originated at GroupM, and we will get back to that culture

(Emphasis added).

## *April 25, 2025*

27.      On April 25, 2025, WPP published a press release announcing the Company's first quarter 2025 financial results. During the associated earnings call, Defendant Read spoke to the macroeconomic landscape and its impact on WPP's potential returns, yet remained confident in WPP's projections, stating, in pertinent part:

And as you know**, we had a challenging fourth quarter. And so we were cautious giving our guidance for the year as well as being aware of some of the tariff issues and discussions that have been taking place**. We did highlight those in our release. And I'd say that our performance in Q1, we saw sales -- net sales down 2.7% is consistent with what we were saying at that time and therefore, very much in line with our own expectations.

**And at the same time, I don't want to give the impression that we're happy with these results. We're not. It's not where we want to be, and we have concrete plans to address the areas of competitive underperformance**, including some steps like the acquisition of InfoSum that we have taken this quarter.

The first quarter did include some encouraging signs. **Our overall performance in the U.S. improved in Q4, albeit benefiting from a slightly soft comp**. I'm also encouraged by the improved new business momentum at VML and Burson following the heavy integration work last year, and it was good to see Hogarth returned to strong growth after challenging fourth quarter.

Against this, **GroupM's growth step down in Q1, in particular in Europe, due to the impact of soft and medium environment. And while the U.S. business for GroupM saw growth in low mid-single digits, it's still below what we would consider to be our competitive performance**. And we'll come later to talk about GroupM in more detail.

10

. . .

At this point, ***we haven't seen any significant change in spending patterns from our own clients*** and our full year guidance remains within the range we set at the beginning of the year. ***We did anticipate broad macro uncertainty. We are very, very vigilant on the outlook and very disciplined on how we are managing the cost base***

. . .

I think as we said in February, we'd already seen a more cautious outlook from clients from Q4 onwards. We've not yet seen any major step down in spending patterns from this. At the same time, we do have to be vigilant and agile. There's no doubt that there's a range of economic and political outcomes over the next day, month, quarter that could cause clients to take a different view on spending.

And while that creates an uncertain environment for WPP***, I do think it's important to note that our absolute and relative exposures are somewhat different from peers***. We've long seen our geographic exposure as a key strategic advantage with apparent global agency group with 60% of our business outside the U.S. And while the U.S. is an incredibly important market for us and always will be, geographic diversity does have its value. Likewise, WPP's balanced exposure by client industry is one of our key strengths***. And while there inevitably disruption for some of our clients, our strong positions, in particular within CPG and technology should be supportive of our growth***. I think you saw some of that in the comments over the last 24 to 36 hours from some of the major CPG companies.

. . .

And the final point that I would make is in regards to the short-term uncertainty created by the macro environment. ***Our clients' focus on and interest in the impact of AI is undiminished***. Indeed, if anything, based on my conversations with clients, the level of interest and focus has increased as clients consider how AI and automation can be used to deliver marketing effectiveness and efficiency, both in the short and medium term.

***On this point, I think the current macro uncertainty is actually acting as a catalyst for some advertisers to revisit how they approach marketing to deal with cost pressures.*** I think we feel more strong than ever that WPP via WPP Open has an enormous opportunity to help clients to drive ROI on their marketing spend as well as save money through deliver greater efficiency to reduce the number of suppliers and reduce costs, but also to embrace a new way of working with more strategic partnerships.

(Emphasis added).

28.    Defendant Wilson elaborated on the Company's and, in particular GroupM's financial performance and further reiterated WPP's prior guidance, stating, in pertinent part:

> **GroupM saw good growth in India, which only partially offset continued weakness in China**. Like-for-like for our other global integrated creative agencies fell 4.4% in the first quarter and compared to the decline of 6.5% in the fourth quarter of 2024. Within this, we continue to see an impact from continued weakness in project-based work, weighing on AKQA performance, a tougher comp, but there will be a further impact in a challenging environment in China.
>
> . . .
>
> We expect performance to continue to be challenging in China in the first half of 2025 with some improvement later in the year. **Against this, we saw a strong performance in India, which was up 5.5%, driven by GroupM**, Central and Eastern Europe also saw a robust performance up 2% in the first quarter.
>
> . . .
>
> And finally, turning to Slide 11, which shows our guidance for the full year. **At the beginning of the year, we set our guidance based on a like-for-like range of flat to minus 2%. This reflected a degree of caution in light of what then appeared to be an uncertain macro environment as well as our expectation of the impact of net new business through the year. Since then, the macro environment has remained uncertain and is likely to be so for a large part of 2025**.
>
> For now**, we remain confident this is reflected in our like-for-like range for the year**. We do think that heightened uncertainty on the macro outlook has potential to further impact second quarter performance. This, coupled with the sequencing of client wins and losses through the year means **we don't anticipate a material change in trajectory in the second quarter compared to the first. We continue to expect like-for-like performance to improve in the second half as more recent wins fully ramp up.**
>
> Overall, we expect to hold headline operating margin broadly flat, excluding the impact of FX, with the benefit of annualized structural cost savings and continued disciplined cost management, offsetting incremental investment in WPP Open AI and data. **We expect GroupM to continue simplifying its structure to accelerate the move to a more client-centric operating model. The impact will be largely P&L neutral over the course of 2025.** However, the timing of associated costs will weigh on H1 margins, which will also be impacted by the phasing of revenue growth.

*Looking beyond revenue and headline operating profit, we make no major changes to our guidance*.

(Emphasis added).

29.    Defendant Read similarly elaborated on the ongoing performance of GroupM, stating, in pertinent part:

> Turning to GroupM. I mentioned at the prelims that the lion's share of the growth gap between us and our leading peers is attributable to the gap in performance of our media business, in particular, in the U.S. ***As Brian outlined in February, we see some encouraging signs of progress on the strategy we launched in January 2024 to simplify and integrate the GroupM offering***, but it is important that we redouble our efforts, and there also have been some challenges.
>
> Brian talked about 5 key priorities he's pursuing around data and technology, people and talent, innovation, collaboration and the organization. ***But we're making good progress on each of these areas***. But I'd summarize the overall progress of business. First, we have to make sure our go-to-market is as simple and integrated as it possibly can be. Further simplifying GroupM not only drives greater cost efficiency, but makes it a simpler and easier business for our clients to do business with, and that's what we mean by moving to a more client-centric model, taking out silos and barriers and costs within the organization to focus all of our resources on client success.
>
> Secondly, essential not only do we catch up, but leapfrog a competitive set in terms of how we use AI, data and technology to drive business outcomes. And I'll talk about InfoSum in a moment, but that's a significant step forward in that area.
>
> And then lastly, in terms of ***new business, it is lumpy***, but I do think we're making progress. The loss of the Coca-Cola North American media business in the quarter was difficult, but we do have a very detailed debrief from the client and a good understanding of our strengths and challenges. We're making good progress towards renewing our broader agreement with that client. ***Meanwhile, in the first quarter, there are some important tangible signs of success***, whether it be the win of the media mandate for EA, Godrej Consumer.

(Emphasis added).

30.    During the question-and-answer segment that followed, Defendants reiterated their confidence GroupM's growth potential and new business opportunities during the following exchanges, in pertinent part:

<Q: Nicolas Langlet – BNP Paribas Exane – Research Analyst> I've got three questions, please. First of all, on GroupM. So you referred in the press release to acceleration of the simplification at GroupM. So does that mean you expect increased cost efficiencies compared to the previous plan? And when do you expect to see the full benefit the initiatives at GroupM? Are we talking end of '25 or more '26?

Secondly, on net new business, what was the impact in Q1? And what phasing should we assume for the next 3 quarters? You said in the past, you expect a neutral impact for the full year. Is it still the case?

And finally, on margin, it seems there is a lot of headwind in H1 and then better trend for H2. So what sort of margin decline should we assume for H1?

. . .

<A: Joanne Wilson> Yes. Thanks, Nicolas. So on GroupM, Brian set out his 5 priorities in February, ***and he and the team are executing against those. And that will build on some of the simplification work that we did last year to simplify both how we operate, drive more client-centric operating model and simplify our go-to-market. There will be cost efficiencies as a result of that. But I think more importantly, it sets GroupM up to deliver market and above-market growth over time.***

In terms of the impact on the P&L, ***we do expect to see an impact on the first half margin from that for the full year, we expect it to be broadly neutral in 2025. And so most of the benefits will be in 2026 just from a pure P&L perspective.***
***In terms of the net new business impact in Q1, it was slightly down year-on-year, and that reflects some of the loss and new business activity.*** In terms of the next 3 quarters, I would just reiterate what I said in February, where we said that we expect in the first half net new business to be a drag, just reflecting those historical client losses that we saw in 2024 and really seeing the full impact of those in H1. ***In H2, we'll benefit more from the ramp-up of recent new business wins, which will help offset some of those losses. So a drag in H1 and a better performance in H2 from that new business.***

And then in terms of margin, there's 2 factors as you really think about margin through this year. In H1, we talked about the impact of that, but also our performance, we've talked about it improving through the year. And therefore, that H1 top line performance will have an impact on our operating leverage and on margin. So those are really 2 factors to think about in H1. ***But I think it's important to reiterate that we are delivering -- we expect to deliver flat margin for the year, excluding FX, and that really is driven by the full year benefit of the structural cost actions that we took last year, continue to be very disciplined around our discretionary spend and delivering back-office efficiencies, which is also enabling us to invest in open AI and data.***

. . .

<Q: Adrien de Saint Hilaire – BofA Securities – VP & Head of Media Research> . . .℀I think, Joanne, you highlighted that you assume that new business contribution would be a positive contribution in H2. But since you provided that guidance, Coke was lost. I think there were some headlines about PayPal the other day. Mars is under review, and I think you're defending that account. So what sort of elements do you have to be sure that H2 is going to be positive indeed for net new business?

. . .

<A: Joanne Wilson> Yes. So just in terms of the [ comps ] to H2, I think I'll say a few things on this, Adrien. So first of all, we have talked about that ramp-up of new wins from H2 last year, which we'll see a fuller impact from that in H2 than we have done in H1, which will help offset some of those historical client losses.

***Second thing I'd say is you talked about Coke and PayPal, but we've also seen new business wins in the first quarter. So Electronic Arts, Heineken, obviously that we've shared in the release. And linked to that, I'd say the pipeline is healthy, so broadly at the same level as last year***. And we have seen good momentum of VML and Burson that has come through a lot of the merger activity that they were focused on last year. ***So we'd expect to continue to improve that new business performance as we go through the balance of the year***.

***And I think the final thing just to say is we talk a lot about new clients and new client wins and losses, but there are other factors. So we talked about growth with our existing clients, top 25 growing at 2.5%. There is plenty of headroom with our existing clients***. We're seeing our existing clients move more towards integrated opportunities. And so we see an opportunity to continue to grow with those existing clients. I think we need to think about that as well as new business wins as we look at the second half.

. . .

<Q: Steven Craig Thomas Liechti – Deutsche Bank AG – Research Analyst> . . .℀ on GroupM in the first quarter. Can you just explain your comments on Europe a little bit more. Just I guess that minus 0.9% could be a bit by surprise. And what's the danger that European pressure continues through into further quarters. So just more clarity there.

. . .

<A: Joanne Wilson> Yes. In Europe, I think if you look at Western Continental Europe rather the U.K. where the U.K. was really impacted for some of these client

losses. We have a tougher comp. But *in media, specifically, we saw some weakness in the environment, particularly in Germany and France*. I'm not vague on, I guess, the share of clients that we have in media, and we have a weaker comp in Q2. So we'll have to see how that plays through in the second quarter. *But it was really that [ tier ] where we just saw softness, which is more macro related than anything else*, Steve.

. . .

<Q: Lisa Yang – Goldman Sachs Group, Inc. – Equity Analyst> . . . just in terms of the actions taken at GroupM since the start of 2024. You mentioned you've seen some encouraging signs. Maybe can you give us a bit more detail in terms of how that has fed through in terms of client retention or expansion of scope or that new business wins, why accelerating the simplification today or this year? And how much more simplification is there to come in other years? Or do you think this is the last leg and help just to understand like how that could basically help the GroupM return to growth.

<A: Mark Read>  I think on GroupM, as you know, as a reference, Pfizer, decision made in May 2023 is still weighing on our results in the first quarter of 2025. So the impact on the business is very long term. And I think GroupM didn't perform as we had wanted in Q1. And some of that is a result of decisions made some time ago.

If you look at the sort of the big new business wins in GroupM last year, we did retain and expand our Unilever relationship. We did win J&J in North America, and we did win Amazon outside the United States. And those are 3 of the world's 10 biggest advertisers.

*So we are not without our success in new business, and we did retain EA in Q1, again, competitively. We won that business against some of the toughest competition in the industry. Now it's true. We didn't retain Volvo after pitch. And while we're renewing it overall Coca-Cola relationship, we won't be working with them in North America.*

*So it is balanced, but I do think that we are seeing more competitive success in new business, and we can beat the best when we're at our best on the best day*. And the InfoSum transaction has -- is going to strengthen significantly our data proposition and we're seeing that with clients. So I think greater clarity on that is perhaps the thing that we have been missing a little bit. *And one of the reasons we brought Brian back was to strengthen the growth of proprietary media, which would drive both financial success and a little bit greater financial flexibility. So I think we know what we need to do in our media business, and I think we can start to see some of the impacts of that, although we're not seeing it necessarily in the quarter-by-quarter numbers.*

(Emphasis added).

<u>May 28, 2025</u>

31.    On May 28, 2025, WPP published a press release announcing the launch of WPP Media, which replaced GroupM as the Company's global media arm. CEO of WPP Media, Brian Lesser stated in relevant part:

> Consumers already expect advertising to be relevant and engaging and buying experiences to be seamless; those expectations are only going to accelerate in the age of AI. WPP Media is built for a world in which media is everywhere and in everything. By investing in our AI-powered product, integrating our offer with data and technology, and equipping our people with future-facing skills, we're helping our clients to stay ahead of rapidly changing consumer behavior and unlock the limitless opportunities for growth that AI will create.

32.    The above statements in Paragraphs 22 to 31 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, WPP's optimistic reports of its potential to achieve new client bid wins and retain its existing clientele fell short of reality; the Company's media arm was not equipped to compete effectively and had begun to lose market share to its competitors.

**The Truth Emerges during WPP's First Half 2025 Trading Update**

<u>July 9, 2025</u>

33.    On July 9, 2025, WPP published a press release announcing the Company's First Half 2025 Trading Update. As part of the press release, WPP updated its full year guidance. In pertinent part:

> WPP is updating the market today on H1 trading and the FY 2025 outlook. ***Against a challenging economic backdrop, we have seen a deterioration in performance as Q2 has progressed***. We now anticipate H1 like-for-like (LFL1) revenue less

pass-through costs to decline by -4.2% to -4.5%, with a decline of -5.5% to -6.0% in Q2 which, although impacted by one-off factors, is ***below our expectations***. We expect the lower revenue less pass-through costs, coupled with severance action at WPP Media, to result in H1 headline operating profit2 in the range of £400m to £425m, which is consistent with a margin decline of 280 to 330 bps year-on-year (excluding FX).

> ***With the expectation of continued macro uncertainty weighing on client spend and weaker net new business than originally anticipated, we are reducing our guidance for 2025 LFL revenue less pass-through costs to -3% to -5% and now expect a year-on-year decline in headline operating profit margin of 50 to 175 bps (excluding FX) reflecting benefits from continued action on costs.***

(Emphasis added).

34.     Defendant Read was quoted in the press release, commenting on the results and slashed guidance as follows:

> ***Since the start of the year, we have faced a challenging trading environment*** with macro pressures intensifying and lower net new business. While we expected the second quarter to be similar to the first quarter, ***performance in June was worse than anticipated and we expect this pattern of trading in the first half to continue into the second half.***

> ***As a result, we are updating our guidance for the full year and reducing our expectations on LFL revenue less pass-through costs growth to -3% to -5% (from flat to -2%) with a year-on-year decline in headline operating profit margin of 50 to 175 bps (vs. around flat previously).***

> Our focus remains on ensuring the right balance between investing in the business for the long-term and ***continuing to reduce structural costs***, while taking appropriate actions to respond to the current trading environment.

(Emphasis added).

35.     As part of the associated earnings call, Defendant Wilson highlighted the Company's missed expectations and provided updated guidance, in pertinent part, as follows:

> So let me take you through our trading performance in the first half and our updated guidance before we open the line for questions. At the outset, I think it's important to recap what we have communicated so far this year. At our preliminary results in February, we set out our expectation for net sales to be flat to down 2% in 2025 with a profile that anticipated a stronger performance in the second half compared to the first.

We expected Q1 trends to be broadly similar to the Q4, which at minus 2.7% like-for-like they were. And at our Q1 trading update in April, we expected similar trends to weigh on Q2 performance, namely the uncertain macro environment to continue and the net new business impact reflecting prior year account losses. In the event, we saw a deterioration in performance as the second quarter progressed with, first, a greater degree of caution on client spending than expected; and secondly, weaker net new business.

This is exacerbated by one-off factors, which impacted WPP Media's performance in the quarter and which we don't expect to continue in the balance of the year. As such, we now expect H1 like-for-like to show a decline of minus 4.2% to minus 4.5% with a second quarter decline of minus 5.5% to minus 6%. Stripping out one-off factors, the underlying run rate like-for-like would be closer to minus 3.6% to minus 3.9% in the half and minus 4.5% to minus 5% for the second quarter. In absolute terms, we expect revenue less pass-through costs of around GBP 5 billion.

. . .

Moving on to headline operating profit. We noted at our Q1 results that the severance actions at WPP Media would weigh on our H1 profit margin. In the first half, we expect our total severance costs to be around GBP 100 million, reflecting the actions in WPP Media and other parts of the business. This represents an incremental severance charge of around GBP 65 million or 120 basis points versus H1 2024.

In addition to a higher severance cost, the weaker net sales performance has also weighed on year-on-year margin performance in the first half despite benefiting from a lower level of accrued incentives. As a result, we expect our first half headline operating profit to be in the range of GBP 400 million to GBP 425 million with a headline operating margin range of 8% to 8.5%. Excluding FX, this reflects a 280 to 330 basis points decline year-on-year.

Turning now to our revised guidance for the full year. ***We expect our 2025 net sales to decline on a like-for-like basis by minus 3% to minus 5%. This compares to the guidance we set at the start of the year of flat to minus 2% like-for-like***. Reflecting a weaker top line, we now expect margins, excluding the impact of FX, to be down 50 to 175 basis points versus previous guidance of flat year-on-year margin. To help build a bridge between our guidance at the start of the year and now, I will provide some context on what has changed.

And let me start with our top line and net new business. Our original guidance anticipated a headwind from net new business in the first half and a tailwind in the second half, leaving the full year impact broadly neutral. This reflected known wins and losses at that time and an expectation on the volume of new business and our win rate. ***We now anticipate a negative impact from net new business for the year***

*as a whole, reflecting incremental client losses and a lower level of new business conversion. We estimate that impact to be around 100 to 150 basis points.*

(Emphasis added).

36.    Defendant Read elaborated further on the Company's issues, stating, in relevant part:

First and most importantly*, the implementation of the new strategy for WPP Media, I would say, is going well, but we're clearly not yet seeing that translate into better business performance*. The InfoSum acquisition has been well received by clients, and it is definitely starting to address the perceived data deficit in our media strategy, but it's early days, and I think it's encouraging. *The restructuring is delivering significant structural cost savings. It doesn't help us in severance in the first half, but that will flow through into the second half, and that's going to help make us more competitive.*

*I think it has come with some distraction to the business. And WPP Media has suffered with a deficit of new business opportunities. The latest convergence tracker shows that new business opportunities in media year-to-date are running about 1/3 of the level in 2025 as they were in 2024.* I do believe that WPP is a strong competitor with an excellent global offer.

Secondly, and linked to that new business issue, new business conversion in terms of win rate is probably similar to last year, but is falling short at WPP Media and a lower level of new business opportunity, and the pipeline in general has made us more cautious in the second half.

And then lastly, we have focused a lot on AI, as you know, I am convinced by the progress in AI and the power of WPP Open and that's being seen in the level and degree of engagement we're having with our top clients and will be seen in competitiveness. I think it's important to say that as we prioritize our investments for the year, we do continue to invest in WPP Open in line with our plans at the start of the year.

(Emphasis added).

37.    In a same-day press release WPP further announced that Defendant Read "will retire from the Board and as CEO on 31 December 2025."

38.     The following day, on July 10, 2025, WPP announced that "that Cindy Rose has been appointed as Chief Executive Officer (CEO) of the Company, effective 1 September 2025. Cindy Succeeds Mark Read who will step down as CEO on the same date."

39.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 27, April 25, and May 28, 2025, press releases and earnings calls. On those calls, Defendants continually touted the ongoing revamp of GroupM a.k.a. WPP Media, the Company's ability to continue to generate bid wins despite competition, and further repeatedly projected an overall neutral year for the media arm, suggesting any client losses would be covered by the continued ramping of additional new client wins and further sales to existing clients. Defendants did so while continually reiterating that their fiscal 2025 guidance factored in the ongoing macroeconomic risk, minimizing any additional risks associated with potential reductions in WPP's current and potential clients' spending behaviors.

40.     Investors and analysts reacted immediately to WPP's revelation. The price of WPP's common stock declined dramatically. From a closing market price of $35.82 per share on July 8, 2025, WPP's stock price fell to $29.34 per share on July 9, 2025, a decline of about 18.1% in the span of just a single day.

41.     A number of well-known analysts who had been following WPP lowered their price targets in response to WPP's disclosures. For example, Barclays, while slashing their price target 27%, summarized the results and key takeaways as follows:

> WPP published a profit warning yesterday, cutting organic guidance for FY25E to a -3.0% to -5.0% range (from flat to -2%) and now expects a margin deterioration of 50-175bps (from roughly flat before).
>
> . . .

21

WPP indicated 100-150bps of the organic net sales downgrade are explained by the drag from lost accounts and a worse-than-expected new biz outlook. The remaining 150-200bps delta at the midpoint is explained by clients cutting spend induced by worse macro (especially among CPG and autos). ***The debate is whether June has really been much worse for everyone or this is more of a WPP-specific issue.*** We came away from Cannes Lions two weeks ago with the general feedback that ***current trading is ok for multiple holdcos. We believe Publicis, in particular, is well cushioned by a significant number of new business wins*** . . . The situation around ***the impending CEO change could suggest that this is more WPP-specific***: a reduction in expectations now to clear the way for the new CEO.

(Emphasis added).

42.     Similarly, Morningstar, while considerably reducing their price target, cautioned that the "cut continues a multiyear negative trend for WPP and reaffirms our belief that it lacks the necessary intangible assets, specifically persistent identity graphs, or PIGs. Management blamed a broadly weak economic picture, but ***we believe the company is losing market share to Publicis*** (emphasis added).

43.     UBS also cut their price target by more than 15% while indicated they "reiterate our Sell on WPP, with operating performance more challenged than we expected. We think the company will continue to lose business this year and do not expect operating performance to improve significantly in 2026 … unless there is a change in strategy or asset mix."

44.     The fact that these analysts, and others, discussed WPP's profit warning and corresponding shortfall and below-market projections suggests the public placed significant weight on WPP's previous projections and statements of confidence in achieving them despite the macroeconomic landscape. The frequent, in-depth discussion of WPP's guidance confirms that Defendants' statements during the Class Period were material.

*Loss Causation and Economic Loss*

45.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of WPP's common stock and operated as a fraud or deceit on Class Period purchasers of WPP's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of WPP's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of WPP's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

46.     WPP's stock price fell in response to the corrective event on July 9, 2025, as alleged *supra*. On July 9, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning WPP's forecasting processes and growth guidance.

47.     In particular, on July 9, 2025, WPP announced significantly below-market sales performance and continued growth expectations, reducing their own prior guidance for fiscal year 2025.

*Presumption of Reliance; Fraud-On-The-Market*

48.     At all relevant times, the market for WPP's common stock was an efficient market for the following reasons, among others:

(a)     WPP's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     WPP communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     WPP was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about WPP was reflected in and incorporated into the Company's stock price during the Class Period.

49.     As a result of the foregoing, the market for WPP's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in WPP's stock price. Under these circumstances, all purchasers of WPP's common stock during the Class Period suffered similar injury through their purchase of WPP's common stock at artificially inflated prices, and a presumption of reliance applies.

50.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

52.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

53.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of WPP who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired WPP's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, WPP's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by WPP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, there were 19.69 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WPP;

(c)     whether the Individual Defendants caused WPP to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of WPP's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

### ***Against All Defendants for Violations of***

### ***Section 10(b) and Rule 10b-5 Promulgated Thereunder***

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WPP common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire WPP's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for WPP's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

64.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of WPP's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to WPP's businesses,

operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of WPP's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired WPP's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

67.    During the Class Period, WPP's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of WPP's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of WPP's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of WPP's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about WPP's misstatements.

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by WPP which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which WPP disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause WPP to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of WPP's common stock.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause WPP to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants and/or WPP are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 9, 2025            Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*