**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACK MARTY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WPP PLC, MARK READ, JOANNE WILSON, and BRIAN D. LESSER,<br><br>Defendants. | Case No.: 1:25-cv-08365-AS<br><br>Hon. Arun Subramanian<br><br>CLASS ACTION<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |
| TEAMSTERS LOCAL 456 ANNUITY FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WPP PLC, MARK READ, JOANNE WILSON, and BRIAN D. LESSER,<br><br>Defendants. | Case No.: 1:25-cv-09930-AS<br><br>Hon. Arun Subramanian<br><br>CLASS ACTION |

# TABLE OF CONTENTS

Page


I. PRELIMINARY STATEMENT ..... 2

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. Defendants ..... 9

C. Relevant Non-Parties ..... 11

IV. OVERVIEW OF THE FRAUD ..... 12

A. Decades Of Unintegrated Acquisitions Left WPP With A Highly Operationally Fragmented Business, Incapable Of Meeting The Industry's Mandate For Integrated Services ..... 12

B. WPP's Most Important Division And "Critical Growth Driver" Was GroupM, Its Media Investment Management Arm ..... 15

C. WPP Announces A Major Multi-Year Corporate Restructuring And Simplification Of WPP And GroupM Aimed At Restoring Profitability ..... 17

D. Throughout The Class Period, Defendants Repeatedly Assured Investors That The Simplification Of WPP's "Critical Growth Driver," GroupM, Was A Success, And That The Initiative Had Resulted In An Integrated Organization Well Positioned To Win New Business ..... 20

E. Former Employees Confirm GroupM Could No Longer Provide The Level Of Services Necessary To Effectively Compete Against Its Industry Rivals, And Was Experiencing Severe Client Attrition ..... 25

1. GroupM's Simplification Was An Obvious, Unmitigated Disaster, And The Problems Were Never Resolved During The Class Period ..... 26

2. Disruption Caused By The GroupM Simplification Program Resulted In Significant Customer Attrition ..... 31

3. "Shaq Playing Against Little Kids": WPP's Touted Data, Technology, And AI Capabilities Lagged Competitors And Contributed to Client Losses ..... 34

4. Former Employees Confirm That WPP's Senior Officers Were Well Aware That GroupM's Operational Deficiencies Directly Led To Client Dissatisfaction And Attrition ..... 43

5. WPP's Rebate-Driven Trading Practices And Opaque Cost Structures Materially Damaged Client Relationships And Caused Severe Client Attrition ..... 45

F. The Truth Gradually Emerges But Defendants Continue To Mislead Investors ... 50

1. "The Restructuring is Behind Us": Defendants Report Poor Financial Results While Simultaneously Assuring Investors That The Simplification Had Occurred ... 50

2. "A Leaner and Less Complex Organization": Defendants Continue To Tout The Successful GroupM Turnaround Despite A Wave Of Major Client Losses, And The Sudden Ouster Of Defendant Read ... 51

3. Defendants Admit WPP Media's Strategy Was Not "Translating Into Better Business Performance" And That Restructuring Caused A "Deficit Of New Business Opportunities," Concluding, "The Issues Primarily Have Been In WPP Media" ... 53

G. Despite Years Of Claiming That GroupM's Simplification Program Succeeded, The Company Admits The Opposite: The Transformation Was A Failure ... 55

H. Post-Class Period Events Provide Confirmation Of Defendants' Fraud ... 59

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 62

A. 2023 Annual Report ... 62

B. First Quarter 2024 Trading Update ... 63

C. 2024 Interim Results ... 65

D. Third Quarter 2024 Trading Update ... 67

E. Preliminary Results 2024 ... 69

F. Annual Report & Accounts 2024 ... 70

G. 2025 Interim Results ... 72

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ... 73

VII. LOSS CAUSATION ... 79

VIII. PRESUMPTION OF RELIANCE ... 81

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ... 82

X. CLASS ACTION ALLEGATIONS ... 83

XI. CLAIMS FOR RELIEF ... 85

XII. PRAYER FOR RELIEF ... 90

XIII. JURY DEMAND ... 90

Lead Plaintiff Teamsters Local 456 Annuity Fund and Teamsters Local 456 Pension Fund ("Plaintiff" or "Lead Plaintiff"), by and through the undersigned counsel, brings this securities class action against WPP plc ("WPP" or the "Company"), WPP's former Chief Executive Officer ("CEO") Mark Read ("Read"), WPP's Chief Financial Officer ("CFO") Joanne Wilson ("Wilson"), and Global Chief Executive Officer ("G-CEO") of GroupM/WPP Media Brian Lesser ("Lesser," and together with Read and Wilson, the "Individual Defendants," and collectively with WPP, "Defendants"). Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all other persons and entities who purchased or otherwise acquired WPP American Depositary Receipts ("ADRs") between March 21, 2024 and October 29, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff's information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things, the investigation of Plaintiff and their counsel, which includes, without limitation: (a) review and analysis of public filings made by WPP with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other parties; (c) review of news articles, analyst reports, shareholder communications, conference calls, and postings on WPP's website concerning Defendants' public statements; (d) review of filings in *Foster v. WPP PLC, et al*., No. 659721/2025 (N.Y. filed Nov. 11, 2025), and *Foster v. WPP PLC*, et al.. No. 1:25-cv-10674 (S.D.N.Y.), remanded back to state court, ECF No. 11 (Jan. 2, 2026); and (e) review of other publicly available information concerning Defendants.

## I. PRELIMINARY STATEMENT

1. This is a securities class action in which U.K.-based advertising giant WPP and its top officers made a series of repeated and public misrepresentations to investors about the Company's dramatic, years-long transformation to simplify and integrate its sprawling operations—a transformation that WPP's new CEO has now admitted ***never occurred***.

2. For decades, WPP was one of the world's largest and most successful advertising and marketing companies, operating hundreds of agencies in over 100 countries. Central to WPP's business was its media buying and investment management division known as "GroupM." Defendants touted GroupM as WPP's "critical growth driver" and primary source of revenue and profit, managing tens of billions of dollars in annual advertising on behalf of some of the most well-known companies in the world. GroupM dominated the advertising world and was widely regarded as "the corporate manifestation of Britain's shining reputation for creative advertising." In fact, analysts noted that, when considering WPP's debt, GroupM alone was worth more than WPP's entire £7 billion enterprise value, underscoring the central importance of the division.

3. In the years leading up to the Class Period, WPP's crown began to slip. The Company fell behind its competitors amidst a major industry shift: clients increasingly demanded integrated services across a wide range of advertising, marketing, data, and digital offerings, and WPP's industry peers were successfully consolidating and streamlining their operations to present unified service offerings to clients. At the same time, WPP was incapable of adapting to this shifting landscape. The Company was the product of a decades-long acquisition spree—a quagmire of hundreds of global agencies operating independently under a holding company structure, with numerous agency brands adopting varying operational, technology, finance, client reporting, and internal management systems. While competitors were presenting clients with attractive, simple offerings across advertising, marketing, data research, and public relations, WPP

could not match that simplicity. The Company's numerous separate agencies remained fragmented and complex, and as a result, WPP failed to operate as a cohesive unit, leading to declining profitability. In fact, the Company's fragmentation was so pronounced that its former CEO, Defendant Read, described it as the result of "thirty years of inactivity" led by his predecessor.

4. As clients began to abandon WPP for more cutting-edge, streamlined competitors and WPP's operating margins and profits declined, Defendants faced an existential crisis: simplify and integrate WPP's complex operations, or face the near-certain takeover or breakup of the once iconic Company. To that end, in 2020, WPP embarked on a multi-year transformation initiative, seeking to reduce operational fragmentation and create a more integrated operating model capable of generating synergies across WPP's global network. The central component of this effort was the restructuring and simplification of GroupM, which included consolidating legacy agency brands, centralizing data and technology platforms, reducing costs, and deploying digital and AI-driven marketing capabilities that were critical to win modern clients. WPP repeatedly represented to investors that, through these critical simplification initiatives, the Company would improve margins, enhance competitiveness, and position WPP for sustainable long-term growth.

5. By January 2024—just two months prior to the start of the Class Period—Defendants claimed that the Company's multi-year transformation was succeeding, and that the business now operated under "a simple operating model" that had "been in progress for 5 years." Indeed, the transformation effort was supposedly so successful that WPP was ready to proceed to the next (and final) phase of the strategy—completing the simplification of GroupM, which Defendants claimed was one of WPP's major "strategic pillars." Accordingly, investors were intently focused on whether the simplification initiative had successfully streamlined the

operations of WPP's most important division and, in turn, saved the fortunes of the entire Company.

6. Throughout the Class Period (March 21, 2024 through October 29, 2025), in earnings calls, investor presentations, and other public statements, Defendants gave investors that exact assurance, repeatedly asserting that the simplification of GroupM was a resounding success, and that the initiative was delivering the operational benefits that Defendants had promised for five years. For example, on March 21, 2024—the first day of the Class Period—Defendants triumphantly proclaimed to investors that "***[o]ver the last five years we've transformed WPP. We're now radically simpler. . . with a modern, integrated offer and simplified structure, and well positioned for growth***." Thereafter, Defendants consistently touted WPP's purportedly "very strong progress" in "the simplification of GroupM," emphasizing that the transformation of the critical division was "absolutely on track" and "progressing well."

7. Bolstering these representations, Defendants repeatedly asserted that WPP had successfully "***restructured***" its business, "***integrated [its] technology***," and launched critical AI-infused tools that supposedly brought GroupM back to "***parity***" with competitors. Indeed, Defendants represented that WPP was already realizing the benefits of the GroupM simplification with "***incredibly positive***" customer feedback, "***minimal***" client-facing disruption, and unified services to clients that supposedly proved that WPP "absolutely ha[d] the capabilities that [clients] need." In fact, GroupM's transformation and simplification was going so well that, by early 2025, Defendants crowed that the GroupM simplification process was "***now largely complete***," and that GroupM had successfully "***underwent a strategic simplification programme, resulting in a leaner, less complex organization***" that had "***reduced complexity and costs***." Accordingly, throughout the Class Period, Defendants repeatedly conveyed to investors that the benefits of

simplification, operational integration and technological modernization had overcome the structural challenges and operational fragmentation created by decades of agency acquisitions.

8. Defendants' statements were false. In reality, GroupM's simplification was nowhere near complete and was a disaster, causing significant internal disruption that had a profound impact on client services and retention. Indeed, major clients were reducing spending or leaving WPP altogether precisely due to the Company's continued operational complexity, declining service quality, and obsolete business practices—particularly in comparison to WPP's industry peers, whose streamlined operations were continually producing more comprehensive, unified offerings. In short, no simplification of GroupM had *ever* occurred, prompting new management to declare at the end of the Class Period that—years after announcing the initiative—GroupM's "unacceptable" financial performance had been driven by such "excessive organizational complexity, a lack of an integrating operating model" that the Company *still* needed to "dramatically simplify how we organize ourselves internally."

9. Significantly, Lead Plaintiff's independent investigation—including interviews with numerous former WPP employees who were directly responsible for implementing the simplification initiative—has confirmed these damning facts. These former employees reported that the internal transformation quickly unraveled and key initiatives were ultimately abandoned. These former employees recalled that, internally, GroupM was in "turmoil," "loads of staff [] vanished," and clients were leaving in droves because "WPP wasn't staffing their contracts." At the same time, the data, technology, and AI capabilities that Defendants publicly touted were equally deficient: employees reported that analytics were "nonexistent" and WPP's AI platform was not functional. As a result, clients increasingly lost confidence in WPP's capabilities, placed major accounts under review, and shifted business to competitors.

10. The truth about WPP's deteriorating operations and the failures within its most important business division began to emerge through a series of disclosures during 2025. Specifically, on February 27, 2025, WPP announced poor financial results for fiscal year 2024, including *negative* 4Q24 organic growth of -2.3%, and issued disappointing guidance for FY25 organic growth of -2% to 0% that fell well short of expectations. On this news, WPP ADRs fell 15%, declining from $48.55 on February 26, 2025 to $41.06 on February 27, 2025—its largest decline in over six years.

11. Nevertheless, Defendants continued to falsely reassure investors that WPP's transformation strategy remained a success, that the "***restructuring [was] behind us***," that GroupM was excelling with clients, and that the Company had the revamped data and AI tools to successfully compete. Analysts were comforted, highlighting Defendants' "key message that the new media go-to-market strategy is out there now and competing effectively in pitches," and as a result, "WPP believes it is now in the right place strategically . . . This makes sense to us."

12. Over the ensuing months, however, WPP suffered a wave of major client losses, including long-time clients such as Coca-Cola, PayPal, Paramount, Abbott Labs, Mars, and others, many of whom defected to industry rivals. Notably, these client defections led to the sudden ouster of Defendant Read as WPP's CEO, which was announced on June 9, 2025, with no replacement announced. Analysts highlighted that "WPP cannot simply claim to be a victim of challenging circumstances when its biggest rivals are winning," while underscoring that the "fact the company hasn't got a replacement chief executive lined up would suggest chaos behind closed doors."

13. One month later, on July 9, 2025, WPP again reported poor financial results and issued a profit warning for the first half of 2025, with negative margins for organic growth that were below analyst expectations. Notably, Defendants acknowledged that WPP had faced "a

deficit of new business opportunities" during the quarter, with "the issues primarily [being] in WPP Media"—the division formerly known as GroupM. On this news, WPP ADRs declined 18%, from $35.82 on July 8, 2025 to $29.34 on July 9, 2025. Significantly, however, to prevent an even greater decline, Defendants minimized the issues WPP was facing, attributing the disappointing results to "one-off factors" that "impacted WPP Media's performance in the quarter and which we don't expect to continue in the balance of the year," including weaker macro conditions and reduced client spending that purportedly formed the basis for lowering guidance.

14. On October 30, 2025, the full truth finally emerged. WPP's new CEO—who had assumed that position just months earlier—admitted that the much-touted simplification had ***not*** occurred, was years away from fruition, and in reality, GroupM had "lost its way." WPP shocked the market by reporting poor financial results, including a worse-than-expected 8.4% decline in revenue for its fiscal third quarter, which the Company stated was "driven by a step down in WPP Media." Moreover, the Company expected its business to continue to decline, with net revenue expected to fall by 5.5-6% in 2025, leading it to slash guidance to -7.5% to -9% in Q4.

15. Significantly, Defendants were forced to admit that the simplification that they had spent years touting to investors was an abject failure, that GroupM had in fact *not* successfully simplified and integrated its operations, and that, as a result, yet another "strategic review [was] underway" to overhaul the Company's deficient operations. Specifically, WPP's new CEO, former Microsoft executive Cindy Rose, admitted that—far from being a simpler, cohesive unit—GroupM's operations remained "very complicated"; the Company suffered from "complexity in [WPP's] organisational structure"; and as a result, WPP needed to "dramatically simplif[y] how we organise ourselves internally." In fact, the Company's operations remained so fragmented that WPP needed to embark on another transformation initiative to become "simpler, more integrated,"

as the Company needed to be "simpler to engage with" and provide an "integrated proposition" to successfully compete for clients. On this news, WPP's ADRs plunged 17%, declining from $23.43 on October 29, 2025 to $19.51 on October 30, 2025.

16. Recent news has further underscored that Defendants' Class Period representations were materially false and misleading. While reporting dismal financial results during a February 2026 earnings call, WPP's new CEO Cindy Rose conceded that WPP was still not integrated, and suffered from the same issues that Defendants repeatedly assured investors throughout the Class Period had been rectified. Indeed, the Company revealed that it would be forced to sell undisclosed assets in order to improve its dire financial position, and had lost its coveted place in the FTSE 100 Index, which tracks the top 100 companies on the London Stock Exchange—a pronounced fall from grace for the entity once described as a company that "ruled the world at one point, it was like the British empire."

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

21. Lead Plaintiff Local 456 are defined contribution plans with a profit-sharing component, composed of Local 456 Annuity and Local 456 Pension, which serve more than 8,600 beneficiaries of Teamsters Local 456 in Elmsford, New York and together have more than $490 million in assets under management. As reflected in their PSLRA certification, Local 456 purchased WPP ADRs during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

22. Defendant WPP is incorporated under the laws of Jersey, United Kingdom with its principal executive offices in London, United Kingdom, and its United States headquarters located at 3 World Trade Center, 175 Greenwich Street, New York, NY 10007. WPP ADRs trade on the NYSE under the ticker symbol "WPP."

23. Defendant Mark Read served as the CEO of WPP from September 2018 through December 31, 2025. Read joined WPP in 1989 and, prior to becoming CEO, held numerous leadership roles across the Company, including Executive Director of WPP, Chief Operating Officer of WPP, Head of Strategy, CEO of WPP Digital, and Global CEO of Wunderman. On June 9, 2025, WPP's Board of Directors (the "Board") announced that Defendant Read would retire from the Board and step down as CEO.

24. Defendant Joanne Wilson has served as Chief Financial Officer ("CFO") of WPP since April 2023 and is also a Director of the Company.

25. Defendant Brian D. Lesser was appointed Global Chief Executive Officer ("G-CEO") of WPP Media in July 2024 and assumed that role in September 2024. Lesser previously held several roles at WPP, including CEO of GroupM North America from 2015 to 2017. He first joined WPP with the acquisition of 24/7 Real Media in 2007.

26. Defendants Read, Wilson, and Lesser are collectively referred to herein as the "Individual Defendants."

27. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of WPP, were privy to confidential, proprietary and material adverse non-public information concerning WPP, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

28. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of WPP's business.

29. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

30. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADRs were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to WPP's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Company's ADRs would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### C. Relevant Non-Parties

31. Cindy Rose ("Rose") has served as WPP's CEO since September 1, 2025. Rose previously served as a Non-Executive Director on WPP's Board from 2019 until her appointment as CEO in 2025.

32. Richard Foster ("Foster") is a former executive of GroupM, serving in various roles, including CEO of Motion Content Group. Foster filed a lawsuit against WPP accusing the

Company of retaliating against him and firing him after he raised concerns that GroupM was operating an improper kickback scheme.

## IV. OVERVIEW OF THE FRAUD

### A. Decades Of Unintegrated Acquisitions Left WPP With A Highly Operationally Fragmented Business, Incapable Of Meeting The Industry's Mandate For Integrated Services

33. WPP was founded in 1971 in the United Kingdom as Wire and Plastic Products plc, a small manufacturer of wire baskets and plastic products. Beginning in 1985, the Company embarked on a decades-long, aggressive acquisition strategy, acquiring dozens of advertising, media, public relations, and marketing services firms worldwide, and consolidating many of the industry's most prominent agency networks. These acquisitions included major global advertising agencies such as Ogilvy, J. Walter Thompson, Young & Rubicam, as well as hundreds of specialized marketing and communications firms.

34. Through this strategy, WPP assembled a vast network of agency brands offering creative advertising, media planning and buying, public relations, branding, data analytics, and market research services to multinational clients. By the 2010s, WPP operated in more than 100 countries, had become the world's largest advertising holding company by revenue, and was included in the FTSE 100 Index, which tracks the largest companies listed on the London Stock Exchange by market capitalization.

35. While WPP's decades of acquisition-driven growth enabled global scale, it also produced significant operational fragmentation. Because acquired agencies were largely allowed to operate independently, the Company never truly integrated its assets. Instead, WPP's agency brands maintained separate management structures, technology platforms, finance systems, client reporting processes, and data infrastructure. This siloed structure fostered a culture of internal competition rather than collaboration. Indeed, because each agency typically operated with its

own profit-and-loss ("P&L") incentives, agency leaders were incentivized to compete internally for client budgets rather than coordinate services across WPP's broader network. In addition, marketing services were frequently divided among multiple specialized agencies within WPP, including creative, media buying, and digital marketing firms. This meant that a single client was often forced to work with several different WPP agencies—each operating on incompatible platforms with mismatched data sets—simultaneously for a single marketing campaign. This fragmented structure created duplication across agencies, making coordination among WPP's agencies increasingly complex and costly, while limiting the Company's ability to provide fully integrated marketing services.

36. Beginning in the late 2010s, structural changes in the advertising industry increased competitive pressure on traditional advertising holding companies like WPP. As the industry moved toward automation and algorithmic media buying, large multinational advertisers increasingly demanded integrated marketing services that could combine creative development, media planning, data analytics, and technology-enabled marketing solutions across global markets. Clients also placed greater emphasis on measurable returns on advertising spend, data-driven decision-making, and advanced digital capabilities, creating additional demand for unified marketing platforms rather than fragmented agency relationships.

37. At the same time, the rise of large digital advertising platforms—often referred to as "walled gardens," including Google, Meta, and Amazon—fundamentally altered media buying dynamics. These platforms controlled substantial portions of global digital advertising inventory, reducing agencies' ability to negotiate pricing advantages across fragmented media publishers and creating a competitive advantage for firms with proprietary data assets, advanced analytics, and AI-driven media capabilities.

38. Competition among advertising holding companies intensified as WPP's principal rivals undertook major structural changes and technological initiatives to simplify their operations and strengthen their technology and data capabilities. For example, rival Publicis Groupe ("Publicis") undertook a major organizational transformation beginning in late 2015 designed to move away from the traditional advertising holding-company model of largely autonomous agency networks and toward a more integrated operating structure that combined creative, media, data, and technology capabilities across the enterprise. Implementation of this new structure was largely completed by mid-2016, when Publicis reorganized the company around integrated "solutions" and client-centric leadership roles intended to give advertisers access to the firm's full capabilities through a single point of contact. Publicis continued expanding its transformation over the following years, rolling out a country-based operating model to further break down internal silos and support integrated service delivery. The strategy was reinforced by investments in technology and data platforms, including the acquisitions of Sapient and later Epsilon, which enabled Publicis to combine data, technology, media, and creative services within unified client offerings.

39. WPP's other two main competitors, Interpublic Group ("IPG") and Omnicom Group ("Omnicom"), likewise pursued initiatives to streamline their agency portfolios, reflecting a broader industry shift away from fragmented agency portfolios toward more unified, data-driven marketing platforms capable of delivering integrated services.

40. While competitors moved towards streamlined, platform-based models, WPP sat on the sidelines. For several years, WPP continued operating under a highly decentralized model with largely autonomous agency networks, distinct leadership teams, and disparate technology systems. This fragmentation created not only coordination challenges but also limited the

Company's ability to consolidate data, track performance consistently, and implement group-wide operational efficiencies. The Company's failure to adapt left it at a competitive disadvantage relative to more streamlined peers. Industry analysts increasingly observed that WPP's complex organizational structure and overlapping agency networks created operational inefficiencies, delayed decision-making, and impeded the Company's ability to provide unified, integrated offerings to multinational clients, leaving it at a competitive disadvantage relative to more streamlined peers. This growing misalignment between market expectations and WPP's internal capabilities underscored the critical need for a strategic transformation to centralize key functions, particularly in areas like media planning and buying, which comprised the Company's most lucrative business.

### B. WPP's Most Important Division And "Critical Growth Driver" Was GroupM, Its Media Investment Management Arm

41. WPP's most important business was its global media investment management arm, historically known as GroupM and recently rebranded as "WPP Media."[1] GroupM provides media planning, buying, data, and investment management services to many of the Company's largest multinational clients worldwide. Its core business involves aggregating billions of dollars in client advertising spending to negotiate large-scale media inventory transactions with publishers, broadcasters, and digital platforms. By combining the purchasing power of multiple global advertisers, WPP Media historically secured favorable pricing, volume-based discounts, and other financial incentives from media vendors. These incentives frequently included rebates, discounted or free advertising inventory, and other commercial benefits tied to the total volume of media

[1] All references to "GroupM" and "WPP Media" are interchangeable.

spending placed through WPP Media. As a result, the scale of WPP Media's operations provided a key competitive advantage within the advertising industry.

42. Until 2024, GroupM was the largest media buying and investment organization in the world, managing more than $60 billion in global media investment on behalf of clients. Its client roster included many of the world's largest advertisers across industries such as technology, consumer goods, and automotive, including companies like Google, Microsoft, Apple, Procter & Gamble, Unilever, Ford Motor Company, Volkswagen, Amazon, Coca-Cola, and Nestlé.

43. GroupM was also the Company's primary revenue and profit driver. It represented the largest component of WPP's Global Integrated Agencies segment, which accounted for approximately 85% of WPP's total revenues.[2] Indeed, financial analysts have highlighted that WPP Media alone was worth more than the approximate £7.5 billion enterprise value of WPP, which includes the holding company's debt. As the Company reported in its Annual Reports filed on March 21, 2024 and March 28, 2025, WPP Media accounted for approximately 38% of WPP's net sales in 2023 and 40% in 2024.

44. Historically, GroupM served as the Company's primary growth engine. The business generated compounded annual growth of 12% in the five years ending in 2014 and maintained average annual growth of approximately 7.5% from 2014 through 2019. Because of the scale of media spending managed through GroupM, the segment's performance had an outsized impact on WPP's overall organic growth, profitability, and ability to win and retain major advertising clients. As a result, investors and analysts closely monitored and focused almost

[2] The Company is organized into three reporting segments: (i) Global Integrated Agencies; (ii) Public Relations; and (iii) Specialist Agencies.

exclusively on GroupM's performance as a key indicator of WPP's overall financial health and competitive position within the global advertising industry.

45. Despite its scale and strategic importance, GroupM remained a highly fragmented and inefficient organization, operating as a collection of siloed legacy entities rather than a unified global platform. Each of its major agency networks—Mindshare, MediaCom, Wavemaker, and Essence—maintained redundant and often incompatible "back-office" infrastructures, including independent Finance, Human Resources, and Information Technology departments. The decentralized structure also affected the efficiency and effectiveness of client campaigns. Media investment decisions, data analytics, and reporting were often duplicated across agencies, and clients with global advertising needs sometimes received inconsistent recommendations depending on the agency handling their account. In addition, the disparate technology and data systems limited GroupM's ability to leverage cross-agency insights, optimize media placement, or provide fully integrated, real-time reporting for multinational clients. This internal fragmentation amplified the systemic challenges facing WPP at the corporate level, creating significant operational gaps that rendered centralization and standardization a strategic imperative.

**C. WPP Announces A Major Multi-Year Corporate Restructuring And Simplification Of WPP And GroupM Aimed At Restoring Profitability**

46. Recognizing that its fragmented architecture was no longer sustainable, WPP launched a multi-year transformation initiative aimed at simplifying the Company's organizational structure, centralizing key technology and data platforms, and improving collaboration across its agency networks. Beginning in 2018, following a period of stagnant growth, WPP launched the first iteration of its "simplification" strategy. The first announcement of the simplification project

was in December 2018, when Defendant Read admitted that WPP had become "unwieldy with too much duplication" to operate efficiently in the digital age. Read stated:

> We are fundamentally repositioning WPP as a creative transformation company with a simpler offer that allows us to meet the present and future needs of clients. . . . The restructuring of our business will enable increased investment in creativity, technology and talent, enhancing our capabilities in the categories with the greatest potential for future growth.

47. On April 17, 2021, Defendants continued their planned restructuring with the launch of "Choreograph," a centralized data and technology platform that was designed to power the media agencies' planning, targeting and measurement capabilities under one global data platform.

48. On April 26, 2022, Defendants announced the next phase of GroupM's transformation, which purported to include major structural changes. The Company's press release issued that date stated:

> GroupM, WPP's media investment group, today announced the latest steps in its transformation to accelerate innovation for clients and further simplify its operations. The moves, which build on the April 2021 launch of Choreograph, WPP's global data and technology company, will merge Essence with MediaCom and Mindshare with Neo and create a new 9,000-strong cross-channel performance platform built on AI technology.

The primary objective of this phase was to transition WPP from a fragmented holding company into a unified "creative transformation company."

49. Notwithstanding these years-long initiatives, in the lead up to the Class Period, GroupM's business continued to deteriorate. For example, on October 26, 2023, WPP reported its third quarter 2023 financial results and disclosed that GroupM's growth had plummeted to just 1.6%—a staggering decline from the double-digit and mid-single digit growth rates that had historically characterized the segment. This lackluster performance contrasted sharply with the "high single-digit" growth reported by its primary rival Publicis during the same period. To

alleviate further investor concern, Defendants publicly announced yet another phase of their purported multi-year simplification of GroupM, this time emphasizing operational efficiency and shared services. The October 26, 2023 press release announced the "[f]urther integration of GroupM with common products and a single technology platform, streamlining of operations and back-office functions" which were expected to drive stronger revenue growth and net annualized cost savings of at least £100 million in fiscal year 2025, with some benefit during 2024.

50. Finally, during the Company's January 30, 2024 Capital Markets Day, Defendants represented to the market that GroupM's multi-year simplification program was a resounding success, and that because the foundational work was complete, WPP was now ready to proceed to the final phase of the strategy, referred to as "Synergy 3.0." Defendants described Synergy 3.0 as "the continued process of simplification at GroupM." The core goals for the third stage of the simplification were to: (i) transition from fractured, agency-specific P&Ls to a single profit-and-loss and management structure; (ii) replace separate, incompatible legacy systems with common technology platforms and shared services, including finance, IT, and HR; and (iii) consolidate duplicate roles and retire non-core brands.

51. Building on the purported success of its structural simplification, WPP represented that it was now positioned to supercharge its completed framework through an annual £250 million investment in AI, data, and technology. This "Innovating to Lead" strategy was anchored by AI, most notably, the WPP Open operating platform, which Defendants claimed successfully integrated proprietary tools and data into a unified system that would drive immediate growth, efficiency, and market share gains throughout the Company and GroupM.

52. During the conference, GroupM's then-Global Chief Executive Officer, Christian Juhl, described GroupM as WPP's "critical growth driver" and assured investors that the

simplification of GroupM was largely complete, assuring investors that the business now operated under "a simple operating model." He explained that the simplification effort had "been in progress for five years" and was "not something new," thereby conveying to the market that the restructuring of GroupM was largely behind the Company. Juhl further assured investors that the next phase of the simplification would not disrupt GroupM's operations or client relationships. According to Juhl, there was "no big bump that's going to hit along the road for that," adding that the Company was "moving very systematically and strategically to not disrupt the business."

53. Analysts responded favorably to the fanfare surrounding the launch of this last chapter of GroupM's synergistic simplification. For example, on January 31, 2024, Citigroup emphasized that although "recent growth has been lacklustre," the Company's ongoing simplification efforts were expected to "drive both better outcomes for clients and significant operational efficiency." Citigroup added that Defendants' positive reassurances "set[] the scene for a significant rerating as and when revenue inflects which we believe could come as soon as the 2Q but certainly by the 2H." Citigroup reported that it "came away impressed," highlighting the Company's "considerable (and highly differentiated) global reach," "strong market positions across media," and "advanced capabilities in AI."

### D. Throughout The Class Period, Defendants Repeatedly Assured Investors That The Simplification Of WPP's "Critical Growth Driver," GroupM, Was A Success, And That The Initiative Had Resulted In An Integrated Organization Well Positioned To Win New Business

54. Leading up to the Class Period, WPP continued to report less than positive financial results. In addition to WPP's core business decline, GroupM was embroiled in a highly publicized scandal in China in October 2023, when authorities raided GroupM's offices and launched an anti-corruption investigation into its media trading practices following whistleblower allegations that client-directed rebates were being improperly retained. The probe and increased scrutiny damaged

WPP's client relationships globally and also resulted in the filing of a whistleblower complaint by GroupM's former CEO, detailed below in § IV.E.5.

55. The convergence of lower operating profits, mounting debts, and inability to effectively compete in an increasingly data-centric industry meant that if WPP and its senior officers could not remedy the underlying issues, the Company was sure to face a breakup and sale of significant assets. Thus, it was imperative that Defendants portray the efforts to simplify GroupM—WPP's primary profit driver—as successful and its strategic evolution as complete.

56. Throughout the Class Period, Defendants repeatedly emphasized that the simplification of GroupM and the deployment of WPP Open had enabled GroupM to operate more efficiently, present a more integrated offering to clients, and win new media business at an accelerating pace, positioning the Company to close the growth gap with its peers. Indeed, Defendants consistently represented that these initiatives had ***already*** been successfully implemented, and that, as a result, the Company's new organizational structure was "simpler and more agile," and any "disruption" to client relationships had been "minimal." Defendants also repeatedly emphasized that GroupM possessed the necessary technology, data, and capabilities to compete successfully for new media business. In particular, Defendants highlighted the Company's investments in artificial intelligence—including its WPP Open platform—and represented that these initiatives were already producing "concrete benefits," including improved new business performance and stronger relationships with major clients.

57. The Class Period begins on March 21, 2024, when WPP published its Annual Report & Accounts for 2023 ("2023 Annual Report"). In the 2023 Annual Report, Defendants touted the purported success of GroupM's multi-year simplification initiative and assured investors that it had already achieved a significantly simplified and integrated organizational structure.

Specifically, the 2023 Annual Report stated: "Over the last five years we've transformed WPP. We're now radically simpler, with. . . a modern, integrated offer and simplified structure." The Annual Report also represented that the Company had made "strong progress on streamlining our business, reducing structural complexity and merging and combining agencies," which purportedly created "a simpler WPP," making it "easier to manage and easier for our clients to access the best of our expertise."

58. Defendants repeated these assurances on April 25, 2024, when WPP issued a press release announcing its financial results for the first quarter of 2024 and held an accompanying earnings call with analysts and investors. In the press release, Defendant Read stated that "GroupM is progressing well with its simplification," adding that clients were "already seeing the benefits" of the Company's "simpler and more agile structure."

59. During the earnings call held later that day, Read similarly represented that WPP's "new simpler organization" was enabling the Company "to move faster and in a more coordinated fashion," while facilitating the deployment of artificial intelligence tools across the organization. Read further claimed that the transformation had been "very well received," particularly by clients who could "see the benefits of a simpler, more agile organization," and that WPP had received a "very positive response from clients and people with really very limited fall back." Defendant Wilson likewise assured investors that the GroupM initiative was "absolutely on track," emphasizing that "the disruption really on the client-facing side is minimal" and that the Company was already beginning to see benefits from the restructuring, with client feedback described as "incredibly positive."

60. During the April 25, 2024 earnings call, Defendants also touted the strength and effectiveness of WPP's data capabilities through its Choreograph platform. Responding to an

analyst question regarding WPP's data and buying platforms, Defendant Read emphasized that WPP possessed a "strong data offer" through Choreograph that included proprietary data assets and extensive global consumer profiles. Read further assured investors that "Choreograph is functioning well" and explained that the platform was "increasingly being deployed within WPP Open," allowing WPP to leverage its data capabilities across the entire organization and embed artificial intelligence tools into client services.

61. Analysts credited these assurances. Bernstein's April 25, 2024 report treated WPP's restructuring as successful, stating that the Capital Markets Day initiatives—including GroupM's simplification—were "on track for targetted cost savings" and supported by a "strong pipeline." HSBC's April 30, 2024 report stated, "We fundamentally like WPP's self-help restructuring story as it continues to merge agencies and take out costs, which should be helpful to top-line growth and margins in time." Deutsche Bank's May 10, 2024 initiation of coverage report accepted the Company's claimed "restructuring" and "business simplification" as an accomplished fact, stating that it was "progressing well" and that WPP was now "closer to the end of the change process than the beginning." Deutsche concluded that simplification had already made WPP "a more manageable business with a better potential growth and margin," and cited the consolidation of "[b]etter performing media agencies" under the GroupM brand—and the streamlining of middle and back-office functions—as evidence that WPP had successfully rationalized its operations.

62. Analysts also treated Defendants' statements regarding WPP's data strategy as credible. Concerning the Company's data capabilities, Deutsche noted that Choreograph connects group transactional, brand, product, and consumer data on a common platform leveraging AI, and stated that WPP was "indifferent to owning large scale consumer profile businesses given its proprietary and transactional data," calling the Company's approach to data "credible." Deutsche

described WPP Open as a centralized AI-powered workflow platform that "bring[s] together AI models for creative, production, media and experience, with ability to interface within a third-party client and digital partner workspace," and concluded that WPP's platform was "on par with/ahead of agency peers."

63. As the Class Period progressed, Defendants continued to assure investors that the simplification of GroupM and deployment of AI initiatives were positively impacting new business performance. For instance, on August 7, 2024, WPP announced its financial results for the second quarter and first half of 2024 and held an accompanying earnings call with analysts and investors. During the call, Defendant Wilson emphasized that the Company had made "very strong progress" in executing the "simplification of GroupM." Wilson further represented that GroupM had already "implemented its new market operating model," which purportedly simplified support functions and integrated growth and marketing efforts, as well as GroupM's go-to-market strategy, under a unified leadership structure.

64. In response to an analyst question regarding the transformation of GroupM, Defendant Read similarly stated that WPP had made "a lot of progress," explaining that the Company had restructured the business, integrated its technology, and launched the WPP Open Media Studio, which he claimed was "resonating" with clients and had made the Company "much more competitive." Read concluded that these initiatives had effectively restored GroupM to "parity," representing to investors that the restructuring and simplification efforts had meaningfully strengthened the Company's competitive position in the media marketplace.

65. Defendants reiterated these assurances on February 27, 2025, when WPP issued a press release announcing its financial results for the fourth quarter of 2024 and held an accompanying earnings call with analysts and investors. During the earnings call, Defendant Read

assured the market that the Company's restructuring was "largely complete" and that WPP could now shift its focus outward, emphasizing that the Company was winning more major pitches, maintaining a strong new business pipeline, and operating with a "much stronger and more integrated proposition for [its] clients" than the prior year. Through these statements, Defendants emphasized that GroupM's transformation had been successfully implemented, creating a simpler, more integrated, and competitive organization that was generating tangible improvements in business performance.

66. Defendants' repeated assurances that WPP's transformation initiatives—particularly the simplification of GroupM and the deployment of WPP Open—were already delivering measurable competitive advantages were false. In truth, internal data and contemporaneous reports reflected persistent operational inefficiencies, client losses, and underperformance relative to peers, directly contradicting Defendants' repeated public assurances.

### E. Former Employees Confirm GroupM Could No Longer Provide The Level Of Services Necessary To Effectively Compete Against Its Industry Rivals, And Was Experiencing Severe Client Attrition

67. In connection with Lead Counsel's independent investigation, Lead Plaintiff interviewed numerous former employees of WPP who occupied senior positions at the Company and had direct knowledge of the severe and pervasive operational problems at WPP.[3] These former employees uniformly confirmed that, contrary to Defendants' public statements attesting that WPP's transformation—and particularly the simplification of GroupM—was progressing

[3] Individuals referred to herein as "FE #" are former employees of WPP and/or its agencies, including Mindshare, MediaCom (later EssenceMediacom), Wavemaker, and Essence. All FEs provided the information described herein to counsel for use in this complaint, with the exception of two FEs specified as interviewed by a third-party service known as AlphaSense (described further below). In order to help preserve the anonymity of the FEs, female gender pronouns are used in connection with all FEs regardless of their gender.

successfully and delivering the intended operational benefits, in truth, the purported simplification was a disaster, causing significant internal disruption that had a profound impact on client services and retention. Further, while Defendants reassured investors that WPP had developed and deployed a sophisticated, AI-driven technology platform that was transforming the Company's operations and providing a meaningful competitive advantage in the marketplace, former employees explained that the Company's purported technology and AI capabilities—including the tools promoted through WPP Open—were far less developed and far less integrated than Defendants represented.

### 1. GroupM's Simplification Was An Obvious, Unmitigated Disaster, And The Problems Were Never Resolved During The Class Period

68. Contrary to Defendants' repeated representations that GroupM had successfully streamlined its operations and created a "simpler" and more integrated organization, WPP remained highly fragmented internally, with legacy agencies, business units, and regional teams continuing to operate on disparate systems and processes that were poorly integrated with one another. Indeed, "Synergy 3.0" and the "four pillars" of simplification were simply rebrands of an already failed strategy.

69. Multiple former employees personally responsible for overseeing and implementing the simplification confirmed that—contrary to Defendants' public representations—the initiatives were a complete failure from inception. Key projects—including ERP integration and Workday deployment—were either rapidly abandoned or poorly executed, and senior transformation leadership was fired midstream and never replaced.

70. FE 1,[4] a former Chief Financial Officer at GroupM, reported that as of April 2024, there was no measurable progress with the simplification process, only employee terminations which led to greater chaos and inefficiencies. While the Company outwardly touted transformational changes at WPP, there was nothing done aside from cutting staff. According to this former employee, due to these cuts, the timeline for returning to financial growth would not occur for at least two to three years because of the complexity of unwinding WPP from a structural perspective and the challenges of completing what was an "admin nightmare" with considerably less staff. The business was in turmoil because WPP was "milking the cash cow and they were trying to cut pieces of meat at the same time."

71. FE 2,[5] a former Transformation PMO Project Manager at GroupM, explained that when she first joined the Company in January 2024, she quickly realized that GroupM's touted simplification was "not going to happen." FE 2 stated that by March 2024, the transformation was effectively abandoned – it was no longer spoken about internally, the transformation teams were being fired, and little meaningful progress was occurring. She observed, "[m]y observation was that they were going to repackage GroupM and sell it off, and that would explain why they stopped with the transformation. They no longer needed to be integrated into the rest of WPP."

---

[4] FE 1 worked in various positions at GroupM from 2006 until March 2024. In her last position, she served as a Chief Financial Officer at GroupM in the UK. In that role, FE 1 reported to Josh Krichefski, GroupM's EMEA (Europe, the Middle East, and Africa) CEO, and Stuart Diamond, Global CFO GroupM, who in turn reported to Defendant Wilson.

[5] FE 2 was a Transformation PMO Project Manager at WPP who worked out of the Company's Transformation office in London from January 2024 through March 2025. FE 2 was responsible for both Finance and HR related transformation projects, including the implementation of Workday, a cloud-based HR, payroll, and financial management software. FE 2 reported to Transformation Director, Ewa Lemarechal ("Lemarechal") until the Transformation Team was disbanded and Lemarechal was laid off in Spring 2024. At that point, FE 2 began reporting to WPP's then Finance Transformation Director, Jeremy Babel ("Babel") until Babel left the Company in December 2024. Thereafter, FE 2 reported to Kristina Baus, Group Managing Partner, Head of Business Operations.

72. FE 2 explained that the Project Management Office ("PMO") was tasked with centralizing all of GroupM's HR and Finance functions and standardizing processes across agencies. One of her main responsibilities was implementing a new ERP system, intended to standardize financial processes and unify accounts receivable and payable across agencies, but the ERP system was never implemented and the PMO teams responsible for overseeing the simplification initiative were disbanded before the project was even near complete. In early April 2024, FE 2's manager, Finance Transformation Program Director Ewa Lemarechal, and her three team members, including the Program Manager, were fired mid-project, leaving only FE 2 on the team. FE 2 said a low-level Project Administrative Assistant was then tasked with managing the ERP implementation. She said by this time, they were "not doing much" with the touted simplification. Chief Transformation Officer, Catherine Wignall ("Wignall"), who oversaw all operations within the Transformation Office, was then terminated in June 2024, and the team continued to be pared down, including Kristina Baus, who was let go at the end of February 2025. She explained that by the time she left in March 2025, the ERP was not completed, and no one was even tasked with working on that implementation. FE 2 stated, "they just gave up" on the transformation; "it was not successful at all." As FE 2 remarked, "It was obvious that the executives in charge of this project did not care" about the transformation.

73. FE 3,[6] a former program manager at WPP, corroborated that implementing a new ERP system was a critical part of the GroupM simplification that was never completed. She noted that part of the ERP implementation was to implement Workday, which was intended to serve as a

[6] FE 3 served as a program manager at WPP from April 2020 until October 2024. FE 3 was responsible for leading strategic IT and cost-efficiency initiatives across all WPP entities. She worked out of the Company's New York headquarters and reported to Simona Falkiewicz, Global Procurement Director, Transformation.

central platform for tracking various internal functions across all of GroupM, but that also went "off the rails," she said—it was "one of [WPP's] biggest problems." According to FE 3, attempts were made to introduce Workday software across the companies but "[i]t never really got off the ground" because it was too complex to roll out. She further explained that the rollout of Workday was supposed to be finished "within a year or two," but "[t]hree or four years later it wasn't even close to being done." FE 3 added that by the time she left the Company in October 2024, the Workday implementation was still "nowhere near" finished and the system implementation "never worked."

74. FE 4,[7] a former GroupM Media Process and Change Manager, confirmed that WPP lacked a permanent, empowered change management function—critical for any large-scale transformation. She reported that she initially agreed to an 18-month assignment but left the Company after four months in April 2024 because it was clear the internal transformation "was going to crumble." FE 4 stated that immediately after she was hired in January 2024, she noticed red flags indicating "Synergy 3.0" was not going well, including the firing of Wignall in early 2024 without a replacement.

75. FE 4 confirmed that, contrary to Defendant Read's statements in April 2024 that the simplification program was "progressing well" and that GroupM was "already seeing the benefits of a simpler and more agile structure for [] clients," the transformation was in shambles. At that time, the Company did not even have a Chief Transformation Officer, she exclaimed. She added that, based on her conversations with other change managers at the time, the general

[7] FE 4 served as a Media Process and Change Manager at GroupM in London from January 2024 until April 2024. FE 4 was part of the Transformation Team and was responsible for supporting the redesign of the Company's media processes by implementing best practices and facilitating the transition towards more efficient operational methods.

consensus internally was that WPP was merely "tinkering around the edges," and "[b]y April 2024, they were not making any headway with their transformation at all."

76. FE 5,[8] a former President of EssenceMediacom UK, likewise stated that the simplification of GroupM was completely ineffective. She stated that the goal of the synergy project was to bring all of GroupM's agencies together and make the WPP Media group the client-facing side of the business rather than each individual agency. She described this strategy as a "big error," emphasizing that it was "not effective" because clients had relationships with specific agencies. FE 5 underscored that the drive to offer a stronger WPP Media conflicted with the reality of what clients had bought into, and created significant confusion within WPP Media, adding "[t]he strategy was unclear, and the deployment of the strategy was not managed very well. It was confusing and ineffective."

77. WPP's entrenched corporate culture exacerbated these failures. FE 3 explained that the Company's component agencies and leaders were resistant to centralization and change. "For thirty years, they always acted by themselves." She said that agencies operated independently, and senior leadership, including CEO Mark Read, would not challenge them, leaving reforms largely unimplemented. FE 3 also described personal consequences for attempting to implement reforms while entrenched agency leaders resisted centralization. She explained, "I got myself in trouble a few times trying to implement reforms. . . I would escalate something to Mark and then I would get into trouble because God forbid I would trouble these people and try to save them money."

[8] FE 5 worked in various roles at MediaCom for 24 years, last serving as a Managing Partner from January 2020 until January 2023. She then worked for EssenceMediacom UK from January 2023 until November 2025 as a Client President. FE 5 was responsible for managing a team of 100 media professionals managing over £400 million in media investments across multiple sectors. She and her team managed the media accounts for Mars, Bayer, TUI Holidays, and Costa Coffee. As a Client President, FE 5 reported to EssenceMediacom COO Satin Reid, who in turn reported to EssenceMediacom CEO Nick Lawson.

78. FE 6,[9] a former Global Managing Partner at GroupM, responsible for Emerging Innovation and Solutions Marketing, added that repeated simplification efforts over the years never gained traction. She said there was "constant transformation since I joined in 2017," but "I never felt confident they would be executed." She explained that "every time these synergy processes would try to galvanize the company, a bunch of Type A characters would push back and maintain their ways of doing business."

**2. Disruption Caused By The GroupM Simplification Program Resulted In Significant Customer Attrition**

79. While Defendants repeatedly represented that any "disruption" on the client-facing side was "minimal" and that WPP received "incredibly positive" client feedback throughout the GroupM simplification initiative, in reality, the exact opposite was true—the transformation initiatives caused significant disruption throughout the Class Period, and clients were fleeing in droves.

80. Multiple former employees confirmed that the constant restructuring and the lack of meaningful progress on the simplification directly contributed to client attrition. For example, FE 7,[10] a former Director at EssenceMediacom, explained, "[t]he constant restructuring creates

[9] FE 6 served in various positions at GroupM from May 2017 through January 2025. In her final role, between 2023 and January 2025, she served as Global Managing Partner for Finecast, GroupM's programmatic TV and addressable advertising platform. During her tenure, FE 6 reported to Finecast's Global CEO, Jakob Nielsen until his departure in November 2021, and then to Nicola Lewis, Global Chief Solutions Officer, WPP Media.

[10] FE 7 served as a Director at EssenceMediacom in the UK for over twenty years, from 2002 until May 2024. In that role she was responsible for the operational structure and model post-merger, driving operational effectiveness. FE 7 reported to a Managing Director, one level removed from the C-suite. FE 7's quotes are taken from an interview done by AlphaSense Expert Insights analysts and published on the AlphaSense platform on March 21, 2025. AlphaSense is a platform that provides access to proprietary research, earnings transcripts, and other documents, including interviews with industry professionals. AlphaSense Expert Insights interviews are recorded, and transcripts of the interviews are published on the AlphaSense platform.

instability within teams," leading to "more disruption." FE 7 further emphasized the global scale of the disruption. Thousands of jobs were lost in the U.K., and with more than 100,000 employees worldwide, the departures created widespread uncertainty and poor internal communication. This instability undermined WPP's historically people-led business model, which relied on client relationships built over time. FE 7 observed, "If the people aren't there and the experience is leaving because of that restructuring. . . [c]lients are certainly vocalizing their dissatisfaction by leaving WPP." FE 7 reiterated that the "perpetual state of restructuring and uncertainty" was driving away clients, adding that the Company needs an "effective restructuring rather than just yet another year of restructuring."

81. FE 1, a former Chief Financial Officer at GroupM, confirmed that client relationships suffered as a result of the internal upheaval caused by the failed simplification program and cost cutting initiatives. FE 1 explained that the problem was that WPP was "internally focused for far too long," stating the Company was "pushing the narrative that they were client centric," but in reality, they were "internally focused." She emphasized that clients recognized that WPP was internally focused and didn't like it, stating, "[w]hen clients get one whiff of you focusing on your own business instead of theirs, they don't like it" because "if you're focused on the business, you're not focused on the clients."

82. The Company's massive cost-cutting initiatives and layoffs of thousands of employees directly affected client service, leading to further client attrition. FE 7 explained that while the Company's messaging was that they were using more AI in order to streamline reduced headcount and improve efficiencies, in reality, that wasn't happening, and clients were recognizing that. She emphasized that "[t]hese tools that are being brought in to do better work for clients,

it's just not happening," and as a result, clients were leaving because they "[weren't] getting the service now."

83. FE 1 confirmed that the Company's cost cutting without the proper automation or AI caused tremendous "internal damage." According to FE 1, WPP never dealt with the Company's "legacy struggles, or automation," instead, they just "cut costs and called that a re-structure." She explained that the problem was "[t]here was no strategy nor automation to make up for the cuts to the workforce. They talked about it but never really implemented anything." As a result, she explained, WPP was starving the business while trying to effectuate a massive transformation, stating "[t]hey were milking the cash cow, and they were trying to cut pieces of meat at the same time," and emphasizing that this strategy was destroying the business, "[t]he business was in turmoil." FE 1 noted that clients started to leave in 2023 and 2024 because WPP wasn't staffing their contracts, adding "GroupM lost the trust of their clients."

84. FE 8[11] stated there is "no question" the streamlining and layoffs in early 2024 "impacted business." She said, "loads of staff vanished, and the work still needed to be completed" so the remaining staff "got totally dumped on," and confirmed that client work "absolutely struggled." She added that layoffs, which began with discussions of "synergy and streamlining" in late 2022, "hit really hard in 2024," both internationally and in the U.S. and said morale at this time was "horrendous."

85. FE 2 confirmed that layoffs disrupted GroupM's client relationships. She explained that clients had remained with GroupM because of long-standing relationships with dedicated

[11] FE 8 served as Vice President Global Strategic Partnerships from September 2021 until October 2024. She was responsible for managing the global relationship between WPP and Google. FE 8 reported to Nilufar Fowler, WPP's Executive Vice President, Global Strategic Partnerships, who in turn reported to Chief Technology Officer Stephan Pretorius, who was a direct report of CEO Read.

client teams, and when those teams were eliminated with no notice or handover, client service suffered: "They started losing clients, which did not surprise me at all. Word was spreading with the clients and WPP did not have a very positive reputation in the industry. . . ." "There was no notice and the clients built these relationships and suddenly, they were gone." FE 5, a former Client President at EssenceMediacom UK, confirmed that the massive cuts had a "big impact" on business in 2025.

86. Collectively, the above testimony confirms that WPP's repeated claims that the GroupM simplification program was progressing smoothly and client disruption was "minimal" were false. Internal upheaval and chronic staffing reductions created a fragile environment in which long-standing client relationships were broken, leading to significant attrition throughout the Class Period.

### 3. "Shaq Playing Against Little Kids": WPP's Touted Data, Technology, And AI Capabilities Lagged Competitors And Contributed to Client Losses

87. Former WPP employees further confirmed that, contrary to Defendants' repeated claims that the Company had developed advanced data analytics and artificial intelligence capabilities, WPP significantly lagged competitors in technology and data tools that determined success in the digital advertising industry. Multiple former employees explained that deficiencies in data analytics, AI tools, and technology platforms made it difficult for WPP to compete, directly contributing to the loss of numerous major clients during the Class Period. In particular, several former employees identified WPP's data analytics platform, Choreograph, as a major weakness. Choreograph was intended to provide centralized data analytics across GroupM agencies, enabling client teams to analyze consumer behavior and optimize advertising campaigns. However, Choreograph's analytics were significantly weaker than those of competitors.

88. FE 9,[12] a former Senior Vice President of Data and Technology at EssenceMediacom, explained that "[t]he bulk of [WPP's] problems" and the primary reason the Company was losing clients was due to Choreograph. Data is a critical component of digital advertising because it allows advertisers to understand consumer behavior and target audiences effectively. However, the data set underpinning Choreograph, called AmeriLINK, was "sparse," meaning there were fewer data points the GroupM agencies could mine to understand individuals' behavior. As FE 9 explained, "[t]here's only so much you can construct" from sparse data, and WPP lacked the "level of depth" available to competitors that had invested heavily in larger and more sophisticated datasets and necessary to generate results.

89. FE 9 further explained that modern digital advertising relies on large-scale data sets to correlate online activity with real-world outcomes. WPP failed to invest in the necessary platforms to perform those correlations effectively. Competitors such as Publicis had invested heavily in third-party data platforms and maintained far more robust data sets, allowing them to provide clients with deeper insights and more sophisticated targeting capabilities. As a result, according to FE 9, competitors had "a good story to sell," while WPP's offering was comparatively weak. FE 9 stated that by late 2023 or early 2024, "there was recognition that there was a problem," and any attempt to "reverse the direction" was too late because WPP was "now five years behind."

[12] FE 9 served as the Senior Vice President of Data and Technology at EssenceMediacom and its predecessor, Essence, from May 2022 to June 2024. In this role she oversaw "data ingress and egress, client and people data, and performance data from ad campaigns." She also managed marketing technology and ad operations and was responsible for "audience building"—the process of identifying individuals who would be the most receptive to a client's product. FE 9 reported directly to EssenceMediacom North America CEO Jill Kelly.

90. Other former employees similarly confirmed that WPP's data strategy lacked clarity and credibility. FE 8, a former Vice President of Global Strategic Partnerships at WPP, explained that "the only two things that matter these days" to media clients are "technology and data," and confirmed that one of the primary reasons GroupM was losing clients during 2024 was the Company's weak data strategy. According to FE 8, despite Choreograph having existed for several years, even senior leaders struggled to articulate its product offerings, commercial model, or WPP's overall data strategy. There was an "overarching incapability internally to articulate what [Choreograph does] and how it is done," which she confirmed "100%" contributed to client losses during the Class Period.

91. FE 10,[13] former Global Head of Partnerships, Advertising, and Retail Technology at GroupM, similarly attributed the Company's struggles to its data story. FE 10 observed that as data and the ability to target audiences became increasingly important, WPP lost the number one spot to competitors because its data story was not "strong enough," "not robust," "lacked substance" and "credibility," particularly compared to competitors. She explained, clients could clearly see the capabilities offered by Publicis and other competitors and see that they could improve performance, whereas GroupM's data infrastructure remained "nebulous and hard to decipher"—Choreograph was "not as compelling, not demonstrable, it's not as easy to understand" as competitors' data stories.

[13] FE 10 worked at GroupM for ten years until May 2024. In her last five years at the Company, FE 10 served as Global Head of Partnerships, Advertising, and Retail Technology at GroupM. In that role, she was responsible for overseeing all of GroupM's global relationships in ad tech or programmatic and retail for Google, Amazon, The Trade Desk, and Microsoft. FE 10 reported to the Head of Investments. FE 10's quotes are taken from two interviews done by AlphaSense Expert Insights analysts and published on the AlphaSense platform on May 22, 2025 and August 7, 2025.

92. FE 1, a Chief Financial Officer in the UK for GroupM, stated that WPP had "plowed a lot of money" into Choreograph, but "it never really worked" and GroupM "never saw any revenue" from it. She explained that one of the big problems with Choreograph was that WPP couldn't monetize it because the Company didn't know how to use the data or demonstrate its benefit to clients, "there was no commercial strategy around it," she stated.

93. Former employees reported that WPP Open—the AI-powered operating system Defendants touted as a unified platform that would bridge the gap between all WPP agencies (e.g., media, creative, data) and seamlessly connect GroupM to the rest of the Company—also failed to deliver the capabilities that Defendants publicly touted to investors and clients. FE 11,[14] a former programmatic media lead, explained that WPP Open, launched internally in 2024, was marketed as a comprehensive interface designed to assist with campaign planning and generate marketing insights. However, according to FE 11, early internal demonstrations of the platform revealed significant flaws. In preparation for the public launch of WPP Open, employees were presented with a series of challenges over a month-long period. One of the challenges, she recalled, was to generate audience personas[15] for a selected Grammy Award winning artist. FE 11 explained that she requested audience personas for Beyoncé's younger U.S. fanbase and the platform generated

[14] FE 11 was a Director, Programmatic at WPP Media's Atlanta, Georgia office from April 2022 until June 2025, when she left voluntarily after an entire string of accounts she had worked on were lost one after another. In that role she oversaw the team responsible for purchasing digital advertisements automatically through specialized technology platforms that buy ad space across websites in real time. FE 11 managed the programmatic advertising function for Walgreens until that account was lost in March 2023. FE 11 then managed programmatic advertising for Uber until that account was lost in December 2023. She then managed the Coca-Cola account until that account was lost in early 2025, and finally Tiffany, until she left the Company in June 2025. FE 11 reported to WPP's Vice President of media throughout her tenure.

[15] In marketing, audience personas are fictional profiles, such as "22-year-old college student, pop fan, heavy TikTok user" or "young professional who likes R&B and live concerts." Audience personas are used to help marketers design campaigns.

personas focused on audiences interested in Japanese anime. FE 11 recalled that the results were so irrelevant that she captured a screenshot and sent it to her supervisor. She emphasized that the platform "sucked," adding that management was "pushing it down everyone's throat, but it didn't work."

94. FE 8 stated that WPP Open was marketed as a client-facing, AI-powered platform integrating data, analytics, and marketing tools across WPP's agencies. According to FE 8, the Company pitched WPP Open to clients as a platform that would allow them to directly access and integrate multiple data sets through a shared dashboard. Clients were led to believe that WPP Open would serve as a collaborative platform providing a "single source of truth" for campaign data and analytics. In reality, however, WPP Open functioned primarily as an internal tool, inaccessible to clients.

95. FE 8 further explained that internally there was significant confusion about WPP Open's commercial model and functionality. She recalled asking the product lead responsible for WPP Open about the platform's commercial strategy and being told, "What would you like it to be?" FE 8 emphasized that the team promoting the platform was "literally making sh*t up." By the time she left WPP in October 2024, FE 8 said the platform remained largely inaccessible to clients, prompting her to remark that "[i]t should be called WPP Shut."

96. Other employees similarly described WPP Open as poorly implemented and unable to support client needs. FE 3 described it as WPP's second "biggest problem," explaining that the platform was intended to allow WPP to present a unified technology offering, but failed to function as intended. According to FE 3, employees frequently complained internally that the Company's various technology systems did not work together and that "nothing works." As a result, she said,

WPP would win a client account, but its internal infrastructure was ultimately unable to support it because it wasn't integrated.

97. FE 12,[16] a former Mindshare Paid Search Account Manager, confirmed that WPP's technology significantly lagged competitors. FE 12 stated that competitors such as Publicis were able to offer integrated technology platforms that connected media planning, execution, and optimization tools, while WPP's systems remained fragmented. FE 12 explained that competitors were also significantly ahead of WPP in developing artificial intelligence tools for social listening, cross-channel optimization, and automated media planning. By contrast, WPP continued to promise clients that similar capabilities were forthcoming, but they never materialized. As FE 12 summarized, WPP repeatedly promised technology solutions that would improve client outcomes, but "it never happened," adding that "WPP is full of promises that never materialize."

98. According to former employees, GroupM's technology deficiencies were widely recognized as a major factor driving client losses. FE 11, a former programmatic media lead who worked closely with clients such as Walgreens, Uber, and Coca-Cola, confirmed that client dissatisfaction with WPP's analytics and data capabilities was widespread. According to FE 11, during 2024 and 2025, the Company experienced significantly more client losses than wins, recalling that "for a good stretch of time, all we heard was—there's an account review, or there's an account loss." While GroupM continued pitching new business, the Company "[wasn't]

[16] FE 12 worked as a Paid Search Account Manager at GroupM's agency Mindshare from July 2024 until January 2025. In this role, she was responsible for the managing the Ford account in Germany, Austria, Hungary, and Switzerland. She managed a €9 million annual search budget used for the launch of new Ford vehicles. She also managed the day-to-day client relationship with Ford for paid search across her assigned regions and ran marketing campaigns for Ford. Since February 2025, FE 12 has been employed by Publicis as a Data and Tech Manager and is responsible for managing Publicis' account with Sky.

winning at the same rate that we were losing." FE 11 said the losses were often attributable to weaknesses in WPP's analytics capabilities.

99. Based on her day-to-day interactions with clients, FE 11 explained that dissatisfaction with GroupM's analytics infrastructure—particularly Choreograph—was a persistent complaint. According to FE 11, "the biggest complaint was that our analytics suck. It was like nonexistent." She explained that Choreograph's analytics team frequently struggled to produce timely campaign analyses and reports for clients. In some cases, it took "months" for the analytics team to produce even a first draft of a post-campaign report, with results sometimes being delivered "four months later." As FE 11 explained, clients expected rapid analysis showing how campaigns performed and whether marketing investments were driving measurable results. Instead, WPP often struggled to provide timely or meaningful insights. She described a "huge gap with analytics," stating that their analytical capabilities were "terrible."

100. According to FE 11, these shortcomings contributed directly to deteriorating client relationships, which she experienced first-hand. She recalled that she was on constant calls with clients and would hear directly client dissatisfaction with WPP's offering. She added that "when every single call the client is complaining and saying things need to be changed, it was easy to realize that you were not adequately servicing the client." For example, she was in contact with her Programmatic counterpart at Walgreens daily, and recalled that concerns about Choreograph were frequently raised during those calls.

101. FE 9 similarly explained that EssenceMediacom had won significant client business based on promises regarding WPP's data capabilities that were "difficult to keep." When those contracts started coming up for renewal in 2023 and 2024, clients were disappointed with the Company's inability to deliver on those promises. As FE 9 explained, when contracts came up for

review, clients frequently asked "what happened here?" after seeing limited results from the data capabilities WPP had promised.

102. According to FE 9, these issues came to a head in 2023 when numerous clients placed their accounts under review. During that year, she participated in approximately 80% of the pitches for EssenceMediacom as the agency's technology representative. During these presentations, clients were "looking at us like we were crazy" when WPP attempted to promote Choreograph as a competitive data solution because the platform lacked the scale and sophistication of competitors' offerings. As FE 9 explained, Choreograph paled in comparison to competing platforms, stating that pitching it against competitors' products was "like Shaq playing against little kids."

103. FE 9 recalled that GroupM's loss of Signet Jewelers' ("Signet") approximately $250 million media account in 2023 illustrated this competitive disadvantage. According to FE 9, the Chief Marketing Officer of Signet confided that WPP's weak data capabilities were a major concern and remarked that meeting with FE 9 was "the only thing that gives WPP a chance" because "their data sucks." Ultimately, the account was awarded to Publicis in April 2023 because of its superior data analytics.

104. Multiple other former employees similarly linked client attrition throughout the Class Period directly to GroupM's technology deficiencies. FE 5, a former President of EssenceMediacom UK, explained that WPP frequently lost pitches to competitors because its data and technology capabilities lagged behind those of rivals—particularly Publicis, which had acquired the data company Epsilon in 2019. According to FE 5, Publicis' integrated data platform created a compelling story for clients and "attracted a lot of new clients for Publicis at our expense." She emphasized that GroupM's weaker data and technology capabilities were

"consistently identified as the most obvious and tangible reason why we were losing pitches." She added that this was "definitely" known as a weakness within GroupM and later WPP Media.

105. According to FE 10, the lack of a clear and compelling data offering caused WPP to lose business during client reviews. Clients frequently provided feedback that WPP's technology narrative was "convoluted," "nebulous," and less compelling than competitors' offerings. As FE 10 summarized, GroupM "fell behind," and the segment was losing business because it could not demonstrate that it had the technology and data infrastructure necessary to support modern digital advertising campaigns.

106. FE 12, a former Mindshare Paid Search Account Manager, confirmed that WPP's technology and AI capabilities were a key driver of client attrition. When asked why large clients, such as the Sky account that she currently works on at Publicis, moved their business away to Publicis, FE 12 explained that the "biggest differentiator" between the companies was the technology and tools they could deliver. According to FE 12, "[a]ll the client leads that I work with all say that our tech and tools [are] the big reason for Sky and other clients to choose Publicis over any GroupM companies." FE 12 explained that clients increasingly recognized that Publicis was "way ahead of the curve" in terms of media technology and AI solutions, and that Sky itself "was able to see that" when evaluating competing proposals. As a result, Sky "made a clear-minded decision based on all of the promises WPP was making," choosing instead to move its business to Publicis, which could demonstrate more advanced and integrated technological capabilities. FE 1 described Choreograph as a "dirty word," because clients did not like it as it had very little benefit.

107. The Company's technology was so bad that GroupM was forced to resort to aggressive pricing concessions to win clients. FE 8 explained that it was important for GroupM to have larger clients in different verticals and regions in order to land additional clients in that

vertical or region, but the only reason the segment was able to win and retain many of these clients was because the Company "completely dropped their trousers" for those clients, giving them sweetheart deals. She emphasized that WPP was "losing money on these clients."

108. FE 13,[17] a Managing Director at Mindshare, who was dedicated to servicing the IBM media account for twenty years, stated that the relationship between WPP and IBM unraveled quickly. "After they put the European business in play, the writing was on the wall," she explained. "Then they put the US business in play." And at that point, she said, WPP decided it did not want to defend its relationship with IBM. When asked why, she explained that for years there had been a quid pro quo element to the relationship, whereby WPP was able to keep the contract in exchange for buying IT infrastructure services from IBM. However, that all changed when that part of IBM, called Kyndryl, was spun off and became an independent entity. This led IBM to put its media account into review: "They said, 'We are giving all this business to you and you are not buying anything from us anymore,' because IBM had split off the parts of its business that WPP was buying IT services from."

### 4. Former Employees Confirm That WPP's Senior Officers Were Well Aware That GroupM's Operational Deficiencies Directly Led To Client Dissatisfaction And Attrition

109. Former employees further recalled that senior leadership was well aware that mounting client dissatisfaction was directly linked to GroupM's deficient operations. According to FE 11, WPP's executives closely monitored client sentiment through internal feedback channels and regular interactions with major clients. For example, Defendant Read personally traveled to

[17] FE 13 worked for WPP in various capacities over 24 years until she left WPP in early 2025. She first worked at Mindshare, before moving to Ogilvy where she remained for over 16 years before returning to Mindshare as a Managing Director. For a large part of her career at WPP, FE 13 was dedicated to servicing the IBM account. She worked in both the UK office and the New York office.

meet with Coca-Cola executives at the Company's Atlanta office after the client placed WPP under review. She advised that another C-suite executive had a very close relationship and frequent interactions with Uber's CFO. FE 11 stated, "They were talking all the time and the hope of retaining Uber was literally riding on that relationship."

110. Similarly, senior executives regularly participated in major client meetings, sales pitches, and reviews. FE 11 and FE 9 advised that JiYoung Kim, Chief Operating Officer, WPP North America,[18] who worked directly for Defendant Read, sat in on all key client meetings and major sales pitches. FE 9 added that WPP's C-suite was "absolutely" aware of how much business was up for review explaining that "because these [contracts] are so huge, you have the highest levels of the organization involved." FE 8 likewise confirmed that the Company's top executives knew exactly why GroupM was not winning new business because the C-suite conducted a post-mortem every time GroupM lost a client pitch.

111. WPP's senior executives also monitored client satisfaction through client surveys. FE 11 stated that client satisfaction surveys—including internal Net Promoter Score surveys—were circulated to monitor GroupM's client relationships, and feedback from those surveys was shared with teams responsible for servicing accounts. Based on these mechanisms and frequent interactions with clients, FE 11 explained that senior leadership was well aware of the growing dissatisfaction among GroupM's major customers.

112. Former employees further recalled that GroupM's product limitations were widely discussed internally. For example, FE 9 stated that she personally raised concerns about Choreograph's limitations with senior executives, including former GroupM North America CEO

[18] JiYoung Kim served as the Chief Products and Services Officer of WPP Media's North America division from January 2022 until January 2024 and has served as Chief Operating Officer of WPP Media North America since February 2024.

Kirk McDonald ("McDonald"), in mid-2023. FE 9 recalled discussing the Company's data problems with McDonald while the two were on the golf course in August 2023 and explaining at length the shortcomings of Choreograph's data capabilities. According to FE 9, she also repeatedly raised these concerns in monthly one-on-one meetings with her supervisor, GroupM's former Chief Marketing Officer Jill Kelly. In addition, FE 9 met directly with a CEO of Choreograph and explained in "more technical terms," that the Company needed a fundamentally different data and product strategy and greater investment in its analytics infrastructure.

113. Former WPP employees further recalled that GroupM's inability to deliver on its data and technology strategy was openly discussed internally. For instance, FE 9 recalled participating in an internal meeting of senior GroupM executives in or around February 2024 in which executives candidly discussed GroupM's weak "product mix," referring to the imbalance between WPP's internally developed technology products and the more sophisticated third-party platforms used by competitors. According to FE 9, this discussion reflected a broader internal recognition that WPP's "homegrown" technology was insufficient to compete with capabilities offered by industry rivals.

**5. WPP's Rebate-Driven Trading Practices And Opaque Cost Structures Materially Damaged Client Relationships And Caused Severe Client Attrition**

114. In addition to client losses stemming from the massive layoffs and data issues, numerous former WPP employees confirmed that mounting resistance from major clients to GroupM's rebate-driven deal structures and proprietary media trading practices had caused severe reputational damage and client attrition. Specifically, for years, GroupM relied on rebates and "purchase risk" inventory deals to secure volume-based discounts and other financial incentives from media vendors. According to multiple former high-ranking WPP employees, these deal

structures were designed to enhance the agency's margins and generate undisclosed revenue streams, rather than maximizing value for clients.

115. Defendants' illicit trading practices were detailed in a bombshell whistleblower complaint filed by WPP's former Global Chief Executive Officer of GroupM Entertainment, Richard Foster ("Foster"). As Global CEO of Motion, Foster worked closely with GroupM and WPP's most senior executives, including Defendant Lesser; GroupM's Chief Operating Officer, Mark Patterson ("Patterson"); Chief Investment Officer, Andrew Meaden ("Meaden"); General Counsel, Nicola McCormick ("McCormick"); and Global Chief Financial Officer of GroupM Investment, Carlos Catalán González.

116. On November 11, 2025, Foster filed a wrongful termination action in New York state court for illegal and retaliatory treatment by WPP after he was terminated for reporting unscrupulous trading practices at WPP Media. Foster's complaint details how for years he repeatedly warned Defendant Lesser and other members of WPP's senior leadership that GroupM was improperly retaining rebates, media inventory, and other financial incentives generated through pooled client spending, and failing to disclose such incentives to clients. Foster estimated that, over the preceding five years, GroupM generated rebate-driven deals valued between $3 and $4 billion, of which it improperly retained approximately $1.5 to $2 billion in incentives WPP was contractually required to pass through to clients.

117. Foster alleged that, despite numerous presentations and internal reports to WPP's executive leadership detailing these concerns and the substantial legal, regulatory, and reputational risks posed by these practices, rather than curtail the challenged practices, Defendants rebranded them. Rebate-driven arrangements were relabeled as "Classic Inventory" or "Purchase Risk" media deals, which were presented in client contracts as inventory acquired "at GroupM risk."

118. In reality, the scale and profitability of these transactions were directly tied to aggregated client spending used to meet vendor volume thresholds and trigger rebates—often delivered in the form of cash, free or deeply discounted inventory, or other services provided at little or no cost. Because those benefits were generated using client funds, they were required to be fully disclosed to the clients whose spending made them possible or passed through in full. Instead, GroupM reclassified the discounted inventory as "proprietary media," resold it to clients through so-called "opt-in" agreements, and retained the spread, recording the resulting revenue as "non-product related income." According to Foster, many of GroupM's largest clients did not "opt in," yet their advertising spend was still used to secure these volume-based rebates WPP improperly retained.

119. By mid-2024, even WPP's CEO, Defendant Read, expressed concern regarding GroupM's performance and vulnerabilities, particularly in North America. Read expressed his support for Foster, disclosing during a June 2024 meeting in London that he wanted to establish a new "WPP Entertainment" division under Foster's leadership. In October 2024, shortly after Defendant Lesser assumed the role of Global CEO of GroupM, at Read's direction, Foster met with Lesser in New York and again raised his concerns regarding GroupM Trading's ongoing reliance on undisclosed rebates and proprietary trading schemes. Lesser acknowledged awareness of the issues and conceded that meaningful reform had not been implemented.

120. On December 12, 2024, Foster memorialized these concerns in a detailed, 35-page report warning that GroupM's "over reliance on" and "prioritization of" Purchase Risk media deals had created mounting commercial, legal, and reputational exposure. He noted that a "significant proportion" of the Company's "largest clients" declined to participate in such arrangements, which were widely perceived as another form of rebates that prioritized GroupM net sales over delivering

value to clients. Foster further warned that top-spending clients—particularly in the U.S.—were resisting these structures because they failed to deliver meaningful pricing advantages. He observed that GroupM remained "unable to promote the vast majority of Vendor deals publicly," a limitation that fueled criticism from pitch consultants and media advisors who counseled clients to avoid agency "proprietary solutions." These pressures, Foster warned, first identified years earlier, reflected growing market skepticism regarding the transparency and defensibility of GroupM's trading model.

121. Almost immediately after Foster's disclosures reached senior management, he was excluded from key meetings, stripped of authority, and removed from active deal participation, before ultimately being terminated on July 10, 2025, in the midst of Defendants' fraud unraveling.

122. Former employees confirmed that the reputational damage stemming from the rebate practices caused clients to discontinue their contracts with WPP. For example, FE 6, a former Global Managing Partner at GroupM, confirmed that the Company's proprietary trading practices systematically prioritized GroupM's financial incentives over client interests. FE 6 elaborated that, for clients with strict Master Service Agreements, WPP was contractually required to provide the retained value to the client, "but [WPP] didn't do that." Instead, GroupM "leveraged all the bonus and sold all that inventory" back to clients. According to FE 6, this practice of "triple-dipping" on margin generated margins of up to 74%, but created both compliance and ethical risks. FE 6 corroborated that senior management "institutionalized" these practices across multiple global businesses. She agreed with Foster that GroupM Trading "adopted policies and practices that prioritized securing rebates and financial incentives for GroupM, often at the expense of client value," and confirmed that this philosophy of "let's just extract as much margin as possible, let's not do the right things by the clients," contributed significantly to client attrition.

123. Other former employees corroborated FE 6's account. For example, FE 8, a former Vice President of Global Strategic Partnerships at WPP, stated that one of the reasons GroupM was losing business during the Class Period was the Company's pricing model and lack of transparency around how costs were calculated. FE 8 explained that WPP had developed a longstanding reputation in the marketplace for "double-dipping"—charging clients while simultaneously monetizing proprietary inventory and data-driven products derived from those same client expenditures. Rather than curtailing these practices, FE 8 stated that WPP effectively rebranded and relaunched its media operations without substantively altering the underlying revenue model. She described the effort as merely repackaging an institutionalized system that senior leadership had long relied upon, stating they relaunched WPP Media by "rolling the same turd in a different pot of glitter."

124. She explained that over time customers grew increasingly skeptical of the sustainability and transparency of WPP's pricing structure and sought to renegotiate or restructure their agreements. But FE 8 stated that WPP had "loads of ways to hide how they were making money" and likened WPP's pricing practices to a shell game, where clients were left attempting to determine where hidden value was being retained. She stated that had clients fully understood how WPP structured its contracts and derived revenue from proprietary media arrangements, "they would have fired them on the spot" years ago.

125. According to FE 8, the lack of transparency and "double-dipping" left a "bad taste" among clients and eventually, clients began to recognize that WPP's trading practices were all fundamentally "self-serving for the agencies," and therefore those clients left when their contracts expired. FE 8 explained that WPP "lost loads of clients the last few years" and attributed those losses primarily to the Company's "intentional" lack of transparency in cost structuring. FE 8

stated that these trends began prior to 2024, but accelerated during 2024 as client scrutiny of WPP's cost structures intensified.

126. FE 8 further corroborated Foster's account that the Company retaliated against employees who raised concerns regarding WPP's trading practices. She explained that any employee who reported issues with the Company's trading practices would be immediately exited from the Company. As FE 8 described it, "hell hath no fury" if a staff member questioned these practices. She further stated, "If you were not on the WPP bus on how we do business, you would be kicked off the bus," underscoring the Company's intolerance of internal dissent and its practice of silencing employees who challenged its conduct.

## F. The Truth Gradually Emerges But Defendants Continue To Mislead Investors

### 1. "The Restructuring is Behind Us": Defendants Report Poor Financial Results While Simultaneously Assuring Investors That The Simplification Had Occurred

127. On February 27, 2025, the truth began to emerge. That day, WPP announced disappointing Q4 2024 results and issued full-year 2025 guidance that fell short of expectations. Q4 2024 organic growth was -2.3%, below consensus of +0.1%. Defendants conceded that "even if… minus 1% [for FY2024 organic growth] was technically in the guidance range, . . . it will be a disappointment." WPP guided FY2025 organic growth of -2% to 0% with flat margins, despite consensus expectations of 1.7% organic growth and a +10 bps margin increase. Notably, Defendants attributed the disappointing results not to any internal issues but to external factors, including an "uncertain macro environment" and the resulting "impact of net new business."

128. In response to this news, WPP ADRs fell 15%, dropping from $48.55 on February 26, 2025, to $41.06 on February 27, 2025. Bloomberg reported, "WPP Plc shares dropped the most in more than six years after the British advertising agency group forecast sales that would remain flat or shrink this year, missing analysts' estimates."

129. Despite these results, Defendants continued to falsely assure investors about the success of the simplification initiative, stressing that GroupM was excelling with clients, that WPP faced no data disadvantage, and that the restructuring had resulted in the Company becoming an AI leader. Defendants' representations stemmed further decline by representing that the simplification was complete. For example, Read continued to claim that WPP had "***achieved significant progress against [its] strategy in 2024 with. . . the simplification of GroupM***," unequivocally asserting that "***the restructuring is behind us***" and that "the strategy we outlined this time last year is on track."

130. Analysts credited Defendants' reassurances. Deutsche Bank highlighted Lesser's "key message that the new media go-to-market strategy is out there now and competing effectively in pitches with the Open platform and a more integrated data approach vs an overly complex offering in the past." Deutsche Bank further noted that although "net new business performance needs to improve further (especially in the US), WPP believes it is now in the right place strategically . . . This makes sense to us . . ."

**2. "A Leaner and Less Complex Organization": Defendants Continue To Tout The Successful GroupM Turnaround Despite A Wave Of Major Client Losses, And The Sudden Ouster Of Defendant Read**

131. Less than a month later, on March 14, 2025, WPP lost its media and data contract with Coca-Cola North America —a marquee account it had held since 2021—to top rival Publicis following a months-long closed review. Coca-Cola was widely regarded by industry insiders as WPP's flagship account, and the lost media business was reportedly worth approximately $785 million in 2024.

132. Over the next several weeks, WPP suffered a string of significant client losses. For example, GroupM unexpectedly resigned from the $286.7 million PayPal account amid signals of client dissatisfaction. TJX Cos. (TJ Maxx's parent company) launched a comprehensive review

and ultimately moved its roughly $344 million U.S. media business from WPP to rival Publicis. And WPP lost Abbott Labs' $300-million-plus U.S. and Canada media account—another defection to Publicis after a client-led review. Paramount also abruptly ended its 20-year global media partnership with WPP, shifting the business to Publicis and Interpublic. The move was executed without a customary review period that typically gives an incumbent the opportunity to retain the business.

133. On March 28, 2025, the Company released its 2024 Annual Report. In order to stem the growing client exodus, Defendants sought to alleviate market concerns regarding the GroupM simplification, and assured investors that the simplification goals had been achieved, stating: "[i]n 2024 GroupM underwent a strategic simplification programme, resulting in a leaner, less complex organization." Defendants added: "[t]his has reduced complexity and costs, supporting faster and more effective decision making and more efficient resource allocation, and in turn enhanced services for clients." Remarkably, these statements were the complete opposite of new CEO Rose's candid characterization of GroupM only months later as a highly fragmented, "very complicated" entity that had "lost its way."

134. Less than three months later, on June 9, 2025, WPP issued a press release announcing the ouster of Defendant CEO Read, who would "retire from the Board and as CEO on 31 December 2025." News reports made clear that Read's departure was not voluntary, but was instead a direct result of the string of client losses WPP had suffered. For example, *The Wall Street Journal*—under the headline "WPP CEO to Depart After String of Ad Client Defections"—made clear the ouster was far from voluntary and framed the announcement as occurring against the backdrop of a company "grappling with client defections." The Drum stated: "WPP cannot simply claim to be a victim of challenging circumstances when its biggest rivals are winning." The

Guardian added that "[t]he fact the company hasn't got a replacement chief executive lined up would suggest chaos behind closed doors." The Guardian also reported that "the final straw for Read came on the first weekend in June when Mars informed the company that it was losing its $1.7bn (£1.3bn) global snacking and petcare business. Read resigned on the Monday morning."

135. WPP's announcement of Read's departure coincided with reports that the Company had taken the unusual step of circulating a "competitive intelligence report" attacking Publicis, prompting industry commentary about the unusually aggressive move. Publicis condemned the report as false, unethical, and emblematic of a broader pattern of declining integrity at WPP, calling it "a disservice to the industry" that "grossly underestimates the intelligence of clients."

136. A day after Read's resignation, public reports emerged that WPP Media had lost control of its $1.7 billion Mars media account to Publicis after a global agency review, which was initially revealed in November 2024. As concluded by Ad Age: "The decision is a significant blow for WPP Media's EssenceMediacom, which had handled Mars' global media account since 2018."

**3. Defendants Admit WPP Media's Strategy Was Not "Translating Into Better Business Performance" And That Restructuring Caused A "Deficit Of New Business Opportunities," Concluding, "The Issues Primarily Have Been In WPP Media"**

137. The following month, on July 9, 2025, WPP reported disappointing financial results and issued a profit warning for the first half of 2025, with negative margins for organic growth—well below analyst expectations. Specifically, WPP reported revenue less pass-through costs implying a like-for-like decline of 5.5% to 6% in the second quarter of 2025. Additionally, WPP lowered its full-year 2025 guidance for like-for-like revenue less pass-through costs to a year-over-year decline of 3% to 5% (from flat to a decline of 2%), which missed analysts' estimates of a 1.2% decline. On the related call with analysts, Read acknowledged that WPP suffered from a "deficit of new business opportunities," and that "the issues primarily have been in WPP Media."

However, rather than attribute those issues to any underlying problems at WPP, Defendants instead blamed WPP Media's poor performance on external factors, including "ongoing macro uncertainty" and other "one-off factors."

138. In response to the announcements, the price of WPP ADRs fell $6.48 per ADR, or about 18%, from a closing price of $35.82 per ADR on July 8, 2025, to a closing price of $29.34 per ADR on July 9, 2025. Bloomberg reported that the closing price was "the lowest since 2009."

139. Analysts were skeptical about this narrative. One analyst noted, "I was a bit surprised to hear that June has been so weak in terms of macro. How can you be sure that your clients are just spending less overall and not just less through your agencies?" Defendants nevertheless doubled down, asserting that "clients are cautious and that cautious extends both into the macro, but to some extent, into new business activity because new business activity is driven by the degree of confidence in the future. . . . And fewer opportunities to drive growth within WPP Media because of fewer pitches." Analysts repeated Defendants' assertions, stating: "[m]anagement insists that the transition of WPP Media under Brian Lesser is going well but is not yet visible in account tenders."

140. The day after WPP's profit warning, on July 10, 2025, WPP announced the appointment of Cindy Rose as WPP's new CEO, effective September 1, 2025. Executive changes continued at WPP on August 29, 2025, when WPP announced Chief Operating Officer and Director Andrew Scott's departure. On September 10, 2025, WPP Media confirmed a major management restructuring in the UK, part of an ongoing global effort to "enhance client-centricity," facilitate greater "agility" and more generally streamline the organization. WPP was reported to have internally announced a similar reorganization in the U.S. the prior month.

141. The following month, on October 20, 2025, The Guardian published an article titled "What's gone wrong at WPP? The crown slips at world's biggest advertising group," underscoring the growing public narrative that WPP's long-standing industry dominance was unraveling. The Guardian reported that "as WPP struggles to stem a growing exodus of clients worth billions of pounds and deal with an existential race to match the AI and data capabilities of rivals, there is hitherto unthinkable talk of a breakup." The article further noted that "a profit warning and dire forecast of revenue decline for this year sent WPP's shares plummeting to their lowest level since the 2008 financial crisis, marking the end of a brutal seven years as chief executive for Mark Read." The Guardian also emphasized the scale of WPP's collapse, observing that the Company's market capitalization had fallen to "just £4bn – compared with its £25bn valuation eight years ago, when WPP was the world's largest marketing services company."

### G. Despite Years Of Claiming That GroupM's Simplification Program Succeeded, The Company Admits The Opposite: The Transformation Was A Failure

142. On October 30, 2025, the full truth emerged. WPP shocked the market by reporting a worse-than-expected drop in revenue for its third quarter 2025. Specifically, Q3 2025 revenue was down 8.4%, a LFL decline of 3.5%; revenue less pass-through costs was down 11.1% reported and 5.9% LFL; and YTD revenue was down 8.0%, a LFL decline of 2.8%. The Company stated: "Performance in the quarter was driven by a step down in WPP Media," with "WPP Media down 5.7%, a sequential deterioration compared to Q2." WPP said it expected net revenue to fall by 5.5-6.0% in 2025, compared to its previous -3.0 to -5% forecast from the quarter prior, while its operating profit margin would be around 13%, below the bottom of its previous range. The guidance slash implied a decline of -7.5% to -9% in Q4. This also implied a 6-10% cut to consensus EPS for the FY.

143. Significantly, WPP acknowledged that, despite telling investors for years that GroupM's simplification program and integration efforts were a success, in truth, those efforts were a complete failure, and as a result, WPP would be forced to embark on yet another multi-year simplification initiative. Specifically, WPP's press release announced that a "strategic review is underway," focused on "four core principles": "(1) simplifying and integrating our client offer and harnessing our AI advantage to deliver growth and business outcomes for our clients; (2) significantly improving our execution and building a high-performance culture; (3) expanding our addressable market through enterprise and technology solutions; (4) strengthening our financial foundations and performance through operational efficiency and a disciplined approach to capital allocation." Notably, these initiatives mirrored the four pillars Defendants had announced at WPP's Capital Markets Day just prior to the start of the Class Period, underscoring that Defendants had made little to no progress despite repeatedly assuring investors that these initiatives were succeeding.

144. In the same press release, the Company's new CEO Rose expressly acknowledged the Company's earlier efforts to blame external "macro" factors for its difficulties were not true, but were the result of GroupM's own actions, stating that "***our recent performance is unacceptable and we are taking action to address this***." Rose also made clear that, in direct contrast to Defendants' repeated assurances that GroupM's simplification initiative was "now largely complete," the exact opposite was true: it was nowhere near complete and GroupM remained highly fragmented and "very complicated." Indeed, Rose stated that, to "deliver performance improvements," WPP would need to make its offering "***much simpler, more integrated, powered by data and AI, efficiently priced and designed to deliver growth and business outcomes for our clients***." Rose further acknowledged that GroupM was so fragmented

and complex that Defendants would have to "***dramatically simplif[y] how we organise ourselves internally***," and further conceded: "***there is a lot to do, and it will take time to see the impact***."

145. On the ensuing earnings call, Rose again acknowledged WPP's failures, admitting "[i]nvestors have been on a challenging journey with WPP, and today's results underline those challenges. I've read the commentary, followed the share price performance. I fully understand, your frustration and the need for action. Our recent performance has not been acceptable."

146. In addition, Rose made additional admissions that directly contradicted Defendants' prior statements. Indeed, Rose admitted that WPP needed to "immediately [] improve [] execution," that GroupM had "***lost its way***," and that the Company "had not gone far enough or fast enough to adapt to the changing needs of clients," who wanted more simplicity and better use of data and AI. While Defendants had repeatedly touted the Company's gains in media, data, and AI throughout the Class Period, Rose now admitted that no such improvement had existed, as clients wanted WPP to be "simpler, more integrated, powered by media, data and AI, efficiently priced and designed to deliver growth and business outcomes" providing a "blueprint for what we need to do differently going forward."

147. Further contradicting Defendants' prior representations that GroupM's simplification program had successfully integrated and simplified the Company's operations, and that Defendants had received wholly positive customer feedback with minimal client disruption, Rose now acknowledged that the opposite was true. Indeed, clients had given "***feedback that…our offer is very complicated***," that they wanted GroupM to be "simpler to engage with," and that an "integrated proposition" "powered by a common data model and AI" was necessary to deliver the outcomes WPP had long promised. "That's where we need to be," she proclaimed. Rose emphasized that this client feedback was "***remarkably consistent***," citing a "lack of clarity

about our end-to-end story," persistent "***complexity in our organisational structure***," and client confusion given WPP's "constraints of an agency structure." In a stark reversal from Defendants' prior messaging regarding GroupM's data and technology capabilities, Rose admitted, "[n]ow have we learned to land it consistently or land the story consistently in a way that resonates with our clients? No, we haven't. And that is fundamentally part of the execution improvement that we're focused on."

148. The market reacted sharply to this news. After closing at $23.43 per ADR on October 29, 2025, WPP's ADR shares plunged $3.92 to close at $19.51 per ADR on October 30, 2025. WPP's ADRs continued to decline over the next two trading days, falling an additional $1.53 for a total drop of $5.45, and closing at $17.98 on November 3, 2025.

149. Analysts and industry observers highlighted Rose's admissions as evidence of the severity of WPP's deterioration and lack of management credibility given that the issues and potential solutions that Rose discussed were virtually identical to the representations that the Company had been providing the market for years. For instance, Barclays issued a report titled, "Similar strategy, different results?" that concluded that management had achieved virtually nothing despite repeated statements to the contrary, emphasizing that WPP's purported new strategy was "similar to Jan 2024's CMD [Capital Markets Day]." Barclays emphasized that given Defendants' past representations, investors were unlikely to "give the benefit of the doubt."

150. UBS similarly highlighted that, although WPP said it was undertaking a strategic review with further detail to come the following year, "the tone of the call suggested investors should not expect radical changes," concluding that this was simply a continuation of the same themes of "better execution, simplification, data and technology." Morgan Stanley's "Long Way to Go" report echoed this view, stating that "WPP has underperformed its peers due, we think, to

a lack of integrated product offering. Clients want their ad agency to be a seamless end-to-end marketing partner."

151. ODDO lowered its price target to 360p (from 520p), highlighting the stark divergence in performance across the major ad agencies. The report pointed out how WPP was the only firm reporting negative results: "its Q3 organic growth was –5.9% (vs. –4.8% expected by ODDO and –5.5% consensus)," compared to Publicis at +5.7%, Havas at +3.8%, and Omnicom at +2.6% (on turnover rather than net revenue). ODDO found that WPP was "doubly impacted by budget losses and a reduction in spending by its existing clients (unconfirmed by its competitors)," and warned that this negative trend was likely to persist into 2026. The analysts further noted that the "numerous departures of managers"—even if framed as part of simplification and restructuring—were likely to reinforce this negative momentum in the near term. Concluding that there were "no operational catalysts in the short/medium term," ODDO cautioned that WPP "may well find itself in a very negative cycle from which it will be difficult to escape."

### H. Post-Class Period Events Provide Confirmation Of Defendants' Fraud

152. Post-Class Period events confirm that the fallout from Defendants' fraud continued to severely impact WPP's financial condition. In November 2025, WPP retained management consulting firm McKinsey to conduct a strategic review and develop a new corporate strategy—an action that further underscored that WPP's prior representations regarding the success of its simplification efforts during the Class Period were false and misleading.

153. That same month, multiple outlets reported emerging takeover interest in WPP from French advertising rival Havas as well as private equity groups including Apollo Global Management and KKR.

154. On December 3, 2025, reports emerged that WPP was being removed from the FTSE 100 after nearly three decades. The Guardian cited the Company's ongoing "struggles to

stem an exodus of clients and match the artificial-intelligence and data capabilities of rivals." The article further noted that, given WPP's "parlous state," analysts believed CEO Rose had only a limited window—approximately one year—to either "turn the business around or break up the [C]ompany, which ha[d] [already] become a takeover target."

155. On February 26, 2026, WPP announced preliminary 2025 results that underscored the depth of its operational deterioration. The Company reported a 10.1% collapse in like-for-like revenue less pass-through costs in Q4 2025, the pivotal holiday quarter, and a 5.4% decline for the full year. WPP further acknowledged that it expected continued negative like-for-like revenue performance—mid- to high-single-digit declines—through the first half of 2026, signaling no near-term recovery. To conserve cash and stabilize its weakened balance sheet, WPP cut its annual dividend to 15 pence per share, more than halving the payout. WPP had identified several assets that it needed to sell, without naming them. A significant proportion of cost savings were also expected to come through reducing jobs.

156. WPP also unveiled yet another major strategic overhaul, Elevate28, "a multi-year strategic plan to simplify and integrate our client proposition, restore growth and drive long-term value for clients, talent and shareholders." The traditional holding company structure would be scrapped in favor of an integrated business around four divisions—WPP Media, WPP Creative, WPP Production and WPP Enterprise Solutions—across four geographic regions. According to the Company's press release, the plan would focus on "stabilising the business" this year.

157. Significantly, Rose reiterated that rather than GroupM's simplification program being "largely complete," in reality, the severe problems that had materially adversely impacted its business were due to the cold, hard fact that such simplification had not occurred. Indeed, in Rose's own words GroupM's "***recent underperformance has been driven by excessive***

***organizational complexity, a lack of an integrated operating model and inconsistent strategic execution***."

158. During WPP's earnings call held the same day, Rose admitted that "***really, the results point to the need for us to embrace a single unified growth strategy to execute with increased rigor and evolve as the needs of our clients evolve***." This admission underscored that WPP's underperformance stemmed from internal operational and strategic issues, not merely external market forces. Rose expanded upon the client criticisms raised in the prior quarter, expressly conceding that GroupM had not undergone the simplification it had publicly represented and remained materially deficient in both data capabilities and infrastructure. Rose admitted that clients repeatedly identified the organization's internal "complexity" as an impediment to delivering the level of client focus GroupM had asserted. According to Rose, "[w]e were siloed," "[w]e were hard to navigate" and WPP failed to take intentional steps "about evolving" its integrated offering "to adapt to the changing needs of our clients." She further admitted that GroupM's delay in establishing a viable data proposition directly contributed to the deterioration of its media business: "It's taken us too long to land our data proposition and our media business has suffered as a result."

159. Due to the continuing fallout from Defendants' fraud, the price of WPP's ADRs has never recovered. As of the date of this filing, WPP's ADRs continue to trade in the $15-$16 per ADR range—a staggering decline of more than 70% from its Class Period high of over $56 per ADR.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. 2023 Annual Report

160. WPP published its 2023 Annual Report on March 21, 2024. In the report, WPP touted the purported success of its multi-year transformation initiative and emphasized that the Company had already achieved a significantly simplified and integrated structure. Specifically, the 2023 Annual Report stated: "***Over the last five years we've transformed WPP. We're now radically simpler*** . . . ***with a modern, integrated offer and simplified structure, and well positioned for growth.***"

161. The statements in ¶160 were materially false and misleading, and omitted material facts when made. Defendants had no reasonable basis to publicly claim that WPP had been "transformed," was "radically simpler," and possessed a "modern, integrated offer and simplified structure." The truth was the exact opposite: WPP had *not* been successfully transformed or simplified during the purported multi-year restructuring effort. Rather, as WPP's new CEO Rose explicitly admitted at the end of the Class Period, the Company remained operationally fragmented and excessively complex, with overlapping agencies, disjointed systems, and internal disruption that hindered integration and undermined client service and growth. Indeed, in CEO Rose's own words, WPP had "lost its way" precisely because of the Company's "complexity in our organizational structure," which resulted in "remarkably consistent" client "feedback that…our offer is very complicated." Rose further acknowledged that WPP's operations remained so inefficiently fragmented and complex that the Company would need to "dramatically simplif[y] how we organise ourselves internally"—it needed to become "much simpler, more integrated, powered by data and AI." In effect, Rose admitted that no transformation or simplification had

ever occurred, as WPP needed a complete, multi-year operational overhaul to achieve what Defendants had spent the entire Class Period assuring investors had already occurred.

162. These admissions are fully corroborated by the compelling accounts of numerous former employees, who confirm that as of March 2024, WPP had made little to no progress toward operational simplification. FE 1 explained by the time she left in March 2024, there was "really nothing done aside from cutting staff" and "[p]ushing two companies together and providing them a new name," which she described as nothing close to a "transformational change." She characterized the internal state of the Company as an "administrative nightmare" so "entangled" with conflicting payrolls and systems that it would take at least two to three more years to structurally unwind. Other senior FEs corroborated this, describing WPP as the "business version of Frankenstein" and noting that GroupM was never effectively "integrated into the rest of WPP."

163. In addition, contrary to Defendants' statements that the Company had a "modern, integrated offer," WPP's operational fragmentation prevented it from delivering the capabilities it promised. FE 3 explained that while WPP had global contracts requiring cross-border and cross-agency coordination, the Company "didn't have the systems in place" to facilitate the necessary data sharing and collaboration. Similarly, a former account manager at Mindshare, confirmed that GroupM never had an integrated technology platform connecting media planning, execution, and optimization, noting that a unified solution for media buying, "never materialized."

**B. First Quarter 2024 Trading Update**

164. On April 25, 2024, WPP issued a press release announcing its financial results for the first quarter of 2024 and held an accompanying earnings call with analysts and investors. During the earnings call, Read represented that GroupM's "***new simpler organization is both enabling us to move faster and in a more coordinated fashion and enabling the deployment of [] AI tools across our organization***." In response to an analyst question regarding whether any

"potential disruption is behind us," Wilson assured investors that the transformation was not distracting from client services, stating that the GroupM agencies and their leadership teams were "spending as much time, if not, more, with clients as they ever would," therefore "***the disruption really on the client-facing side is minimal.***"

165. The statements in ¶164 were materially false and misleading, and omitted material facts when made. While Defendants claimed that GroupM's "new simpler organization" was enabling faster, more coordinated execution, the truth was the exact opposite: the Company remained a collection of siloed legacy agencies operating on incompatible platforms. Indeed, as the Company's new CEO admitted at the end of the Class Period, WPP was not a "simpler organization" but remained plagued by the very same operational fragmentation and "complexity in our organizational structure" that Defendants claimed to have solved during the Class Period. In fact, underscoring that Defendants' claims had no basis in fact, CEO Rose admitted at that late date—*five years* after the transformation initiative had been announced—GroupM's "underperformance has been driven by excessive organizational complexity, a lack of an integrated operating model and inconsistent strategic execution" and WPP still needed to "dramatically simplif[y] how we organize ourselves internally," which would require yet another intensive, multi-year operational overhaul to achieve.

166. These admissions were fully corroborated by numerous former employees, including FEs 1, 2, 3, 4, and 6, each of whom uniformly and independently reported that by April 2024, no significant progress had been made on the simplification program beyond mere headcount reductions. As these former employees attest, at the same time that Defendants were claiming the opposite, internally it was well known that the Company remained years away from structurally unwinding its complex business model.

167. Moreover, contrary to Defendants' assurances that the restructuring was causing only "minimal" client-facing disruption, former employees confirm that GroupM's simplification effort was a disaster that triggered significant "instability" and "disruption." These sources explained that "constant restructuring" had caused such "disruption" that clients were leaving because they "aren't getting [the] service." As one former GroupM CFO aptly explained, the segment was in "turmoil." Far from achieving agility, competitiveness, or early benefits from AI integration, WPP was losing key media accounts, underperforming peers, and failing to execute the very strategy Defendants claimed was progressing "very well." Indeed, by late March of 2024, a former Transformation Project Manager at GroupM confirmed that while the Company was boasting of its success in simplifying GroupM, the opposite was true. By this time, Defendants had disbanded nearly the entire Transformation Management Team responsible for the initiative in order to cut costs, a goal which could not be achieved while simultaneously restructuring the Company. This was corroborated by a former GroupM Manager, who confirmed the touted restructuring was in shambles at this point in time.

**C. 2024 Interim Results**

168. On August 7, 2024, WPP announced its financial results for the second quarter and first half of 2024 and held an accompanying earnings call with analysts and investors. During the earnings call, Defendant Wilson continued to emphasize that WPP had "***made very strong progress***" in executing "***the simplification of GroupM***." Wilson further elaborated on the purported progress of the simplification of GroupM, stating: ***"GroupM has implemented its new market operating model, simplifying support functions and integrating growth and marketing efforts as well as GroupM's go-to-market strategy under one leader***."

169. During the call, an HSBC analyst asked management to provide additional color regarding the measures WPP had taken to simplify and transform GroupM. In response, Read

explained that the Company had "***restructured***" its business, "***integrated [its] technology***," and launched Open Media Studio, which he claimed was "resonating" with clients and brought GroupM back to "***parity***":

> Joseph Philip Thomas
>
> . . . And then just ***turning to GroupM. I was interested in what you're saying, Mark, about the various measures that you have taken there.*** It would just be useful if you could just kind of go through them and ***identify what the issue was that you feel was there in GroupM and how these measures rectify what the problem was and hopefully drive growth in the future.***
>
> Mark Read
>
> * * *
>
> I think ***over the last year, we've made a lot of progress***. We have a new CEO, GroupM in North America. ***We've restructured, and we brought our new business team. We've integrated our technology and launched WPP Open Media Studio that's resonating. I think this made us much more competitive. So I think all of that brings us, let's say, to parity.***

170. The statements in ¶¶168-69 were materially false and misleading, and omitted material facts when made. While Defendants conveyed to investors that the Company had already successfully "restructured" its business and implemented an integrated GroupM operating model, the truth was the exact opposite, as in reality, GroupM remained a collection of siloed legacy agencies operating on incompatible and conflicting platforms. Indeed, Defendants' own admissions at the end of the Class Period underscore that no successful restructuring or integration of the Company's operations ever occurred. WPP's own CEO Rose acknowledged that the Company critically needed to become "much simpler, more integrated, [and] powered by data and AI"—the very advancements that Defendants publicly touted in the above misrepresentations. In fact, the Company's operations remained so cripplingly complex at the end of the Class Period that Rose admitted GroupM was afflicted by "excessive organizational complexity" and would have to "dramatically simplif[y] how we organise ourselves internally."

171. Defendants' admissions were corroborated by the accounts of numerous former employees, each of whom confirmed that GroupM's purported "restructured" operations was a façade. In reality, the Company never addressed its "legacy struggles," and instead, simply "cut costs and called that a re-structure." Rather than achieving efficiency, WPP remained complex and fragmented, leading it to continue to underperform its peers and fail in the execution of its core strategy. Further, contrary to Read's statements that WPP Open provided an "integrated" technology offering that made GroupM "more competitive," former employees who personally used the platform stated that the systems were not integrated and failed to improve client outcomes. In reality, WPP's deficient technology was "consistently identified as the most obvious and tangible reason why [WPP was] losing pitches." Far from reaching "parity," the Company's technology gap was a primary driver of its inability to retain or win major accounts.

**D. Third Quarter 2024 Trading Update**

172. On October 23, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 and held an accompanying earnings call with analysts and investors. During the earnings call, Defendant Read closed his remarks by triumphantly proclaiming that WPP's restructuring had been a resounding success and was largely complete, and that the Company could now shift its focus outward. In Read's own words: "***we can be more externally focused now with much of the restructuring behind us***."

173. Analysts credited Defendants' assurances, repeating them verbatim in positively reporting on WPP. J.P. Morgan's October 23, 2024 report asserted that WPP's "creative transformation plan to simplify the business, make it easier for clients to access its expertise, remove duplicated costs and realise back office efficiencies, invest in creativity, technology and talent, is largely complete," and further claimed that WPP had "strengthened GroupM leadership after a period of underperformance," was making AI "increasingly central to its strategy," and was

seeing "broad adoption" of WPP Open. J.P. Morgan also noted that Defendants' representations were "lead[ing] indicator[s]" of renewed competitiveness and "improving momentum" and a "closing of the growth gap" relative to peers. Citi Research emphasized that Defendants' representations "validate[d] the strategic actions taken last year to . . . simplify GroupM. . ."

174. The statements in ¶172 were materially false and misleading, and omitted material facts when made. While Defendants claimed that WPP's critical restructuring initiative was largely complete and had unified the business, in reality, the Company had made no meaningful progress towards operational transformation or simplification. Indeed, as the Company's new CEO made clear at the end of the Class Period, WPP had "lost its way" precisely because of the "complexity in our organisational structure." In fact, the attendant issues plaguing the Company's operations were so severe and pervasive that even at that late date—*years* after Defendants had claimed the transformation initiative was a success—CEO Rose admitted that GroupM was plagued by "excessive organization complexity" and still needed to "dramatically simplif[y] how we organise ourselves internally" in order to effectively compete in the industry against its more streamlined and effective competitors.

175. Furthermore, additional contemporaneous facts show that, at the time of Defendants' statements, GroupM's operations remained highly fragmented, and the ongoing restructuring effort was causing significant operational and client disruption, all of which directly led to severe client attrition. Indeed, numerous former employees confirmed as much. For example, FE 8 explained that a multi-million-dollar plan to centralize back-office systems had been scrapped years prior, in 2021 or 2022, and by the time she left the Company in October 2024, WPP's agencies continued to operate with separate P&L, IT, HR, and invoicing systems—a state she described as the "business version of Frankenstein." Former employees described GroupM as

being in a "perpetual state of restructuring and uncertainty," and reported that the "constant restructuring" led to "more disruption" and ongoing "turmoil," and was driving away clients in droves because WPP was "not focused on [its] clients."

**E. Preliminary Results 2024**

176. On February 27, 2025, WPP issued a press release announcing its preliminary financial results for 2024 and held an accompanying earnings call with analysts and investors. In the press release, Read again claimed that WPP had "***achieved significant progress against [its] strategy in 2024 with . . .*** the ***simplification of GroupM.***" During WPP's earnings call, Read similarly stated that the Company "***made great progress in our strategic transformation infrastructure***." Read added that "in terms of network consolidation and simplification [of GroupM]," the "***good news is this is now largely complete***… ***we have a much stronger and more integrated proposition for our clients***." Similarly, Defendant Lesser emphasized that the Company had "***taken significant steps***" on integration, technology, and execution, insisting that GroupM was "***a unified company with one voice to clients and partners***," and that ***in 2024, WPP*** "***made significant strides in eliminating complexity***."

177. The statements in ¶176 were materially false and misleading, and omitted material facts when made. Defendants had no basis to claim that GroupM's "network consolidation and simplification" was "largely complete," that the Company had an "integrated proposition for our clients," that GroupM was "a unified company with one voice to clients and partners," and that the Company had "eliminat[ed] complexity." Indeed, just months later, the Company's newly-appointed CEO Rose would be forced to admit that the truth was the exact opposite. WPP had ***not*** made "great progress" on its transformation, had ***not*** completed GroupM simplification, and was nowhere near offering the "stronger," "more integrated," or AI-led proposition they described. Indeed, Rose admitted that GroupM had "lost its way" precisely because no simplification or

transformation had ever occurred. Rather, the Company still suffered from crippling "complexity in our organisational structure," and WPP had received "remarkably consistent" feedback from current and former customers that the Company's offerings were "very complicated" without an "integrated proposition." In fact, WPP's operations remained so fragmented and complex that Rose admitted it needed to "dramatically simplif[y] how we organise ourselves internally." Thus, it was materially false for Defendants to claim, in past-tense, concrete terms, that they had achieved a critical transformation and simplification initiative, when only months later, they would be forced to admit that no such achievement had ever occurred.

178. Moreover, former employees confirm that GroupM's operating model continued to suffer from structural dysfunction, inconsistent execution, and technology gaps that directly contradicted Defendants' claims of integration, efficiency, and competitiveness. WPP never dealt with the Company's "legacy struggles," but only implemented superficial headcount reductions. Indeed, by March 2025, even the ERP implementation, which was necessary to consolidate back-office functions, was "nowhere near" finished and "never worked." Former employees observed that internally at this time, it appeared the Company had "just gave up" on the transformation.

**F. Annual Report & Accounts 2024**

179. On March 28, 2025, WPP released its 2024 Annual Report. The Report asserted that "***in 2024 GroupM underwent a strategic simplification programme, resulting in a leaner, less complex organisation***," and that new centralized innovation and operations hubs were now "***developing, standardising and scaling media products and technology across its business***." According to WPP, these changes had "***reduced complexity and costs***," enabled "***faster and more effective decision-making***," improved "***resource allocation***," and "***enhanced services for clients***." Indeed, the 2024 Annual Report explicitly highlighted these purported achievements:

**Simplifying a world leader: GroupM**

GroupM, a global leader in media planning and buying, manages over $60 billion in worldwide advertising spend. In 2024 GroupM underwent a strategic simplification programme, resulting in a leaner, less complex organisation. New centralised innovation and operations hubs serve as GroupM's engine for developing, standardising and scaling media products and technology across its business. This has reduced complexity and costs, supporting faster and more effective decision-making and more efficient resource allocation, and in turn enhanced services for clients.

Building on this progress, Brian Lesser joined GroupM as Global CEO in September 2024, focused on improving the competitiveness of its media offer, globally and in the US, and leveraging WPP Open Media Studio, which provides end-to-end media workflows for GroupM and its clients.

groupm

180. The statements in ¶179 were materially false and misleading, and omitted material facts when made. While the Company claimed its simplification program had produced a streamlined organization with centralized hubs and improved client service, the truth was the exact opposite. Indeed, just months later, WPP's new CEO Rose would be forced to admit that no successful simplification had ever occurred, and that the Company remained severely fragmented and complex. Significantly, Rose acknowledged that GroupM had "lost its way" precisely because of these unresolved issues, and in order to compete, the Company would need to embark on yet another operational overhaul to "dramatically simplif[y] how we organise ourselves internally."

181. Additional contemporaneous facts corroborate that GroupM remained operationally fragmented at the time of Defendants' statements. As numerous former employees confirmed, WPP's restructuring was not successful and was not efficiency-enhancing; rather, it was a source of internal chaos that drove major clients to move their business to more integrated competitors. For example, this operational failure was confirmed by FE 2, a former Transformation PMO Project Manager at GroupM who was a key member of the Transformation Team. FE 2 stated that when she left the Company in March 2025, the same month the Annual Report was published, GroupM was still not "integrated into the rest of WPP."

Crucially, she revealed that the transformation Defendants touted as a success had, in reality, been effectively abandoned. The Annual Report's portrayal of a successfully simplified and more competitive GroupM was further belied by admissions from CEO Rose in October 2025—several months later—that WPP still needed to become "much simpler" and "more integrated," while significantly improving the very execution, technology, and go-to-market strategies that Defendants represented were already functioning as centralized, scalable successes.

### G. 2025 Interim Results

182. On August 7, 2025, the Company published its 2025 interim results. Defendant Lesser assured investors that WPP Media was a "***fundamentally different company than it was a year ago***," with a "***simplified, aligned organization***," a "***modern capability set***," and "***restructured teams to focus on transformation, growth and client experience***."

183. When analysts specifically inquired about whether staff reductions were having an impact on client relationships, Defendant Wilson flatly denied that staffing changes were contributing to client losses, stating: "[***S]pecifically to client losses, I mean, the short answer is no. It's not driving client losses***," she stated.

184. The statements in ¶¶182-83 were materially false and misleading, and omitted material facts when made. Contrary to Defendant Lesser's claims that WPP had become a "fundamentally different company" with a "simplified, aligned organization," the newly-branded WPP Media remained an operationally fragmented entity burdened by the same fundamental structural failures that had undermined GroupM. Indeed, only two months later, the Company's new CEO would be forced to admit that Defendants' representations were false: WPP "recent performance [was] unacceptable" and the GroupM business had "lost its way" precisely because no successful transformation or simplification of the Company's business had ever occurred. Indeed, Rose explicitly acknowledged that because this fundamental fragmentation and

complexity still plagued WPP's operations even years after Defendants publicly claimed the opposite, the Company would have to "dramatically simplif[y] how we organise ourselves internally." Defendants thus had no reasonable basis to make the concrete, past-tense representations to investors highlighted above.

185. Moreover, while Lesser touted that the "restructured teams" were focused on "growth and client experience," and while Wilson assured investors that staffing cuts were "not driving client losses," contemporaneous facts confirm that the Company's significant headcount reductions gutted client services and triggered widespread account attrition. FE 1 explained that the Company failed to address its "legacy struggles," choosing instead to "cut costs and call[] that a re-structure." This strategy of "milking the cash cow" while failing to implement necessary automation caused tremendous "internal damage" and left the business in a state of "turmoil." FE 1 further noted that the Company failed to implement the necessary automation to compensate for a reduced workforce, GroupM was unable to adequately staff client contracts, and effectively "lost the trust of their clients. Similarly, FE 8 stated there was "no question" the layoffs decimated the business, stating that "loads of staff [] vanished" while the "work still needed to be completed." These failures were corroborated by FE 7, who noted that while the Company messaged that AI was streamlining the work, in reality, "it's just not happening," and clients were leaving because they "aren't getting the service now." FE 2 confirmed that these massive headcount reductions had a "big impact" on GroupM's business in 2025, emphasizing that client losses were "no surprise" given that "clients built these relationships and suddenly, they were gone."

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

186. As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the Company's business, operations, and prospects, including the simplification of GroupM and WPP's purported

superiority in AI, technology, and data, were materially false and misleading when made. In addition to the allegations set forth above, these particularized facts include the following.

187. *Defendants' admissions at the end of the Class Period demonstrate their knowledge that their Class Period statements were false and misleading when made.* At the close of the Class Period, WPP's new CEO made a series of stunning admissions that reinforce a strong scienter inference. First, on October 30, 2025, WPP's new CEO, Rose, admitted that the much-touted GroupM simplification had ***never*** occurred and was years away from fruition. Remarkably, despite relentlessly promoting the simplification initiative as a resounding success, and that the initiative was delivering the operational benefits that Defendants had promised for five years, Rose conceded that the initiative was an abject failure, that WPP had ***not*** successfully simplified and integrated its operations, and that, as a result, yet another "strategic review [was] underway" to overhaul the Company's deficient operations. Rose acknowledged that, far from being a simpler, cohesive unit—GroupM's operations remained "very complicated"; the Company suffered from "complexity in [WPP's] organizational structure"; and as a result, WPP needed to "dramatically simplif[y] how we organise ourselves internally."

188. Second, Rose acknowledged soon after the Class Period that WPP Media was still not integrated, the Company's failure to simplify its key operating segment was destroying the Company, and needed yet another sweeping restructuring initiative to become "simpler, more integrated," and easier for clients to engage with. Rose, openly acknowledged that GroupM's "recent underperformance has been driven by excessive organizational complexity, a lack of an integrated operating model and inconsistent strategic execution." Rose further conceded that WPP had remained "siloed" and "hard to navigate," and that the Company had failed to timely develop a viable data proposition—deficiencies that clients had repeatedly identified and that materially

impaired the Company's media business. Rose admitted that "it's taken us too long to land our data proposition and our media business has suffered as a result," underscoring that WPP's operational shortcomings were the product of longstanding internal failures rather than sudden market headwinds. These seriatim admissions by WPP's own CEO are powerful indicia of scienter.

189. *Defendants repeatedly assured investors that GroupM's simplification initiatives were successful, delivering operational benefits, and positioning the Company for long-term growth.* The Individual Defendants professed to be highly knowledgeable about GroupM's simplification initiative and the purportedly successful execution of the simplification effort and discussed each on myriad occasions with investors during the Class Period. The Individual Defendants spoke repeatedly and in highly specific terms about GroupM and the purported success of its simplification initiative in nearly every investor conference and earnings call during the Class Period, and gave detailed updates and responses to analysts' frequent inquiries on these topics. That Defendants' misstatements concerned the specific subjects about which Defendants frequently communicated with investors during the Class Period, including in response to highly specific questions by analysts, supports a strong inference of scienter.

190. *The abrupt and widespread executive departures are highly probative of scienter.* Towards the end of the Class Period, as the Company was forced to report disappointing financial results and decreased projections driven primarily by issues in WPP Media, the Company announced the abrupt departure of numerous senior WPP and GroupM executives. The number and timing of their departures is telling, as is the market's harsh reaction.

191. In January 2025, just one month before WPP was forced to disclose *negative* organic growth of -2.3% for Q4 2024, and issued disappointing guidance for FY25 organic growth

of -2% to 0% that fell well short of expectations, it was announced that GroupM U.S. Chief Investment Officer Matt Sweeney, who had been with the Company for more than a decade, was exiting. Not long after, GroupM EMEA CEO Josh Krichefski departed in March 2025 after fourteen years, and EssenceMediacom's former global CEO Nick Lawson exited after thirty-three years, followed by his interim successor, global COO Frances Ralston-Good, who left in March 2025. Nicolas Bidon, global CEO of WPP Media's Nexus, departed in June 2025 after having been in his post at Nexus since April 2022.

192. In June 2025, WPP announced that Defendant Read would step down ***just days*** after GroupM lost the $1.7 billion global Mars account, one of its largest and most strategically important clients. According to The Guardian, Mars informed WPP over the first weekend in June, and "Read resigned on the Monday morning," making the temporal connection unmistakable. Defendant Read's resignation was widely viewed as a sign of internal crisis, not a planned transition. The timing, the absence of a successor, and contemporaneous reporting that tied his exit to client defections and deteriorating performance all support a strong inference that Defendants were aware of the Company's mounting operational failures even as they publicly claimed that GroupM's simplification initiative had been a resounding success.

193. The financial media also picked up on the departure of multiple other high-level WPP and GroupM executives. An October 31, 2025 report published by Bernstein underscored significant senior-level churn across WPP, documenting a pattern of high-profile departures that reflected deep instability within the organization. The report's chart of exits showed that turnover was not isolated but persistent and concentrated among the Company's most experienced leaders,

directly contradicting Defendants' repeated assurances that GroupM was executing effectively:

EXHIBIT 5: **Recent WPP departures**

**Departures**

| Name | Role | Tenure | Date |
|---|---|---|---|
| Lindsay Pattison | WPP Chief People Officer (formerly Chief Client Officer) | 16 years | 20/02/2025 |
| Nick Lawson | EssenceMediacom CEO | 35 years | 01/03/2025 |
| Frances Ralston-Good | GroupM EM global COO | 5 years | 01/03/2025 |
| Josh Krichefski | GroupM EMEA CEO | 14 years | 01/03/2025 |
| Katie Rigg-Smith | WPP ANZ Chief Strategy officer | 26 years | 02/05/2025 |
| Beth Ann Kaminkow | WPP's VML CEO | 4.5 years | 01/06/2025 |
| Nicolas Bidon | GroupM Nexus global CEO | 12 years | 30/06/2025 |
| Brian Vella | AKQA APAC CEO | 24 years | 03/07/2025 |
| Chris Wade | WPP Global Director of Communications and Corporate Affairs | 13 years | 07/07/2025 |
| Sally Kissane | Ogilvy Network ANZ CEO | 30 years | 07/07/2025 |
| Andrew Scott | WPP COO | 26 years | 29/08/2025 |
| Shaun Frazao | WPP Media Global Growth Strategist (head of data and technology) | 7 years | 02/09/2025 |
| Carol Middleton | Client MD Wavemaker | 25 years | 08/09/2025 |
| Claudine Collins | Chief Client Officer EssenceMediacom UK | 30 years | 12/09/2025 |
| Mark Reid | CEO of WPP group | 30 years o/w 7 as CEO | 25/09/2025 |
| Rahul Titus | The global head of influence at Ogilvy and WPP Open X | 12 years | 02/10/2025 |
| James Mackenzie | Chief Investment Officer EssenseMediacom | 8 years | 06/10/2025 |
| Sharb Farjami | WPP Media North America CEO | 4 years | 08/10/2025 |
| Rafael Rizuto | Ogilvy - North America Chief Creative Officer | 1.25 years | 22/10/2025 |
| Tesa Aragones | AKQA's North America CEO | 3 years | 24/10/2025 |
| Jabari Hearn | AKQA's Americas Chief Marketing and growth officer | 3 years | 24/10/2025 |

Source: company reports, trade press, Bernstein analysis

194. *GroupM's failed simplification effort caused massive client exodus and severe financial and operational fallout*. For decades, WPP maintained stable growth, with GroupM as its cornerstone media investment division generating a substantial portion of the Company's revenue and serving many of its largest global clients. That all changed when, under pressure from clients and the markets, WPP was forced to embark on a multi-year transformation initiative to reduce operational fragmentation and create a more integrated operating model capable of generating synergies across WPP's global network. The initiative, however, failed, leading to widespread operational disruption, the abrupt departure of multiple senior executives, and the loss of several key global accounts, most notably the $1.7 billion Mars global media account. These failures ultimately forced the Company to sell undisclosed assets to shore up its financial position and caused it to fall out of the prestigious FTSE 100 Index—a stark decline for a company once described as one that "ruled the world at one point, like the British Empire."

195. *Defendants' direct involvement in managing GroupM's largest client relationships and overseeing GroupM's simplification initiative further demonstrates that they were aware of the operational and technological problems undermining the simplification initiative.* For example, CEO Read bragged on earnings calls before and during the Class Period that he was "every day showing CEOs and CMOs how [WPP Open] can transform their marketing efforts." GroupM CEO Lesser similarly assured investors that "since rejoining GroupM," he was "engag[ing] extensively with [GroupM's] clients to understand their needs." Former employees confirmed that WPP's executive management maintained close relationships with clients and regularly interacted with major clients. For example, according to FE 11, Read personally traveled to WPP's Atlanta office to meet with Coca-Cola after the client placed WPP under review, while another C-suite executive maintained frequent communications with Uber's CFO because, as FE 11 explained, "the hope of retaining Uber was literally riding on that relationship." Former employees further reported that WPP's Chief Operating Officer, JiYoung Kim—who reported directly to Read—attended all key client meetings and major sales pitches, and that because the contracts at stake were so large, "the highest levels of the organization [were] involved." According to FE 8, WPP's C-suite also conducted post-mortem reviews after every significant lost pitch and closely monitored client sentiment through internal feedback channels including regular client surveys, meaning senior executives knew precisely why GroupM was failing to win new business.

196. *GroupM's centrality to WPP's business further supports a strong inference of scienter.* Until 2024, WPP Media was the world's largest media buying organization, managing more than $60 billion in annual spend for major global advertisers and serving as WPP's primary revenue and profit engine, accounting for roughly 38–40% of net sales and the vast majority of the

Company's revenue base. Analysts valued WPP Media alone at more than WPP's entire enterprise value. In the lead up to the Class Period, Defendants described the "simplification" and "integration" of GroupM as one of WPP's four major "strategic pillars" of growth, and asserted that these initiatives had largely been implemented and were enabling GroupM to operate more efficiently, deliver a more integrated offering to clients, and win new media business at an accelerating pace. Defendants further touted GroupM as WPP's "critical growth driver" that would "improve our overall performance" and help close the Company's growth gap with its peers. Given GroupM's outsized contribution to WPP's revenue and profitability, and Defendants' repeated emphasis on the success of the simplification initiative as central to the Company's growth strategy, it is implausible that the Individual Defendants were unaware of the true state of that initiative.

## VII. LOSS CAUSATION

197. During the Class Period, WPP ADR's traded on the NYSE. The market for WPP's ADRs was open, well-developed and efficient at all relevant times. Throughout the Class Period, Defendants' materially false or misleading statements alleged in § V. above created and/or maintained artificial inflation in the price of WPP ADRs. Defendants engaged in a scheme to deceive the market, and in a course of conduct that operated as a fraud or deceit on Class Period purchasers of WPP ADRs, by failing to disclose and misrepresenting the adverse facts detailed herein. When the facts misrepresented and concealed by Defendants' prior materially false or misleading statements gradually became apparent to the market, the price of WPP ADRs fell precipitously, as the prior artificial inflation created and/or maintained by Defendants' materially false or misleading statements dissipated. As a result of their purchases of WPP ADRs during the Class Period, Plaintiff and other Class members suffered economic loss, i.e., damages, under federal securities laws.

198. By issuing materially false or misleading statements, Defendants presented a misleading picture of WPP's business. Defendants' materially false or misleading statements caused WPP's ADRs to trade at artificially inflated levels throughout the Class Period.

199. Indeed, WPP's ADRs reached a Class Period high of $56.55 on December 9, 2024, before losing nearly 70% of its value to close at $19.51 per ADR following the last corrective disclosure, wiping out more than $443 million in market capitalization.

200. The artificial inflation created and/or maintained by Defendants' alleged misrepresentations and omissions was removed from the price of WPP's ADRs in direct response to information made public in the corrective disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed.

201. First, before the markets opened on February 27, 2025, WPP announced its financial results for the fourth quarter of 2024 and issued full-year 2025 guidance that fell short of expectations. *See also infra*, ¶127. That same day, the price of WPP's ADRs fell 15%, dropping from $48.55 on February 26, 2025, to $41.06 on February 27, 2025.

202. Second, before the markets opened on July 9, 2025, WPP reported disappointing financial results and issued a profit warning for the first half of 2025, with negative margins for organic growth—well below analyst expectations. Defendants acknowledged that WPP had faced "a deficit of new business opportunities" during the quarter, with "the issues primarily [being] in WPP Media." *See also infra*, ¶137. That same day, the price of WPP ADRs fell $6.48 per ADR, or about 18%, from a closing price of $35.82 per ADR on July 8, 2025, to a closing price of $29.34 per ADR on July 9, 2025.

203. Third, before the markets opened on October 30, 2025, WPP issued a press release announcing a worse-than-expected drop in revenue for its third quarter 2025, driven by poor performance in WPP Media. Later, on the accompanying conference call, WPP's new CEO, Rose, admitted that the GroupM simplification had never occurred and was years away from fruition. *See also infra*, ¶¶142-47. After closing at $23.43 per ADR on October 29, 2025, WPP's ADRs plunged $3.92 to close at $19.51 per ADR on October 30, 2025. WPP's ADRs continued to decline over the next two trading days, falling an additional $1.53 for a total drop of $5.45, and closing at $17.98 on November 3, 2025.

204. As detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of WPP ADRs and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of WPP's ADRs fell precipitously, as the prior artificial inflation came out of the price.

**VIII. PRESUMPTION OF RELIANCE**

205. At all relevant times, the market for the Company's ADRs was an open, efficient and well-developed market for the following reasons, among others:

a) WPP's ADRs met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, WPP filed periodic reports with the SEC and the NYSE;

c) WPP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) WPP was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

206. As a result of the foregoing, the market for WPP's ADRs reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's ADRs. All investors who purchased the Company's ADRs during the Class Period suffered similar injury through their purchase of WPP's ADRs at artificially inflated prices, and a presumption of reliance applies.

207. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding WPP's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

208. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading

statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

209. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of WPP who knew that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

210. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased WPP ADRs between March 21, 2024 and October 29, 2025, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of WPP at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

211. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, WPP ADRs actively traded on the NYSE (an open and efficient market) under the symbol "WPP." As of December 31, 2024, the Company had more than 98 million ordinary shares outstanding, represented by more than 19 million American Depositary Shares (ADSs), which are evidenced by American Depositary Receipts (ADRs) or held in book-entry form. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

212. Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

213. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

214. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of WPP;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of WPP;

e) whether the market price of WPP ADRs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

215. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

216. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WPP shares; and (iii) cause Lead Plaintiff and other members of the Class to purchase WPP ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

218. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for WPP ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

219. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about WPP's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of WPP's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about WPP and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's ADRs during the Class Period.

220. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

221. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing WPP's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its ADRs. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the

misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

222. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of WPP shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased WPP ADRs during the Class Period at artificially inflated prices and were damaged thereby.

223. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that WPP was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their WPP ADRs, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

224. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

225. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

226. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

227. The Individual Defendants acted as controlling persons of WPP within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

228. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

229. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the

Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## XII. PRAYER FOR RELIEF

230. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIII. JURY DEMAND

231. Lead Plaintiff demands a trial by jury.

Dated: March 13, 2026

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com

Emily Bishop (*pro hac vice* forthcoming)

505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
ebishop@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker
Dianne Pitre (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: *<u>/s/ Steven B. Singer</u>*
Steven B. Singer